**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:19-cv-07957 |
| ) | Judge Jorge L. Alonso |
| COMMUTER RAIL DIVISION OF THE ) | Magistrate Judge Gabriel A. Fuentes |
| REGIONAL TRANSPORTATION ) | |
| AUTHORITY, d/b/a METRA, ) | |
| ) | |
| Defendant. ) | |

**METRA'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO DISMISS OR STAY BASED ON PRIMARY JURISDICTION**

Defendant, Commuter Rail Division of the Regional Transportation Authority, d/b/a Metra ("Metra"), pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1), submits this memorandum in support of its motion to dismiss or stay, stating as follows:

## I. INTRODUCTION

During Union Pacific's negotiations with Metra for a new contract for the operation of commuter service on Union Pacific's rail lines, Union Pacific brought this action, asking the Court to find that Union Pacific has no legal obligation to provide commuter rail service to, on average, more than 80,000 daily commuters. In doing so, Union Pacific seeks to gain leverage in its negotiations with Metra. If the commencement of this action were motivated by a genuine need for an answer to the common carrier question, Union Pacific would have petitioned the federal agency that it alleges is charged with oversight and exclusive regulatory jurisdiction over the interstate rail system—the Surface Transportation Board ("STB").

1

Whether Union Pacific, in the absence of a contract with Metra, must provide commuter rail service or can decline to do so, is best addressed by the STB. Because the Complaint raises novel questions of railroad policy and regulation—over which Congress has given primacy to the STB—the Court should invoke the primary jurisdiction doctrine and dismiss the Complaint without prejudice, or in the alternative, stay the matter pending consideration by the STB.

## II.  UNION PACIFIC'S ALLEGATIONS

Union Pacific Railroad Company ("Union Pacific") currently provides commuter rail service to Metra under a Purchase of Service Agreement ("PSA"). Complaint ¶ 2. Under the PSA, Union Pacific, in exchange for compensation paid by Metra, operates and maintains commuter trains on three lines between the Ogilvie Transportation Center in Chicago and, respectively: Kenosha, Wisconsin ("North Line)"; Harvard, and McHenry, Illinois ("Northwest Line"); and Elburn, Illinois ("West Line") (collectively, "UP Lines"). *Id*. at ¶¶ 2, 3, 20. Union Pacific also operates freight trains on these lines. *Id*. at ¶ 3.

The PSA was set to expire on February 29, 2020 (*Id*. at ¶ 22), but has since been extended by the parties to a date beyond a scheduled negotiating session.[1] The parties began their negotiations for a new contract in 2019. *Id*. at ¶ 4. Union Pacific advised Metra it wants to discontinue operating the commuter service that Union Pacific and its predecessors have provided pursuant to state and/or federal law for nearly five decades, and transfer commuter service to Metra. *Id.* at ¶ 7.

---

[1] Both Union Pacific and Metra have publicly stated that their disagreements will not result in any interruption of service. Union Pacific pledges to "accomplish an efficient, seamless and timely transition of the operation of Metra's commuter rail service on Union Pacific's lines…."  Complaint ¶ 7.

1026844\305325490.v1

Union Pacific's Complaint seeks to bypass an STB determination on Union Pacific's common carrier obligation to operate commuter service on the UP Lines. *Id.* at ¶¶ 6, 26. Union Pacific denies that it has an obligation to provide passenger service. *Id.* In doing so, Union Pacific relies upon Amtrak legislation (the Rail Passenger Service Act of 1970 (Pub. L. No. 91-518, 84 Stat. 1327), and the ICC Termination Act ("ICCTA") (49 U.S.C. § 10101 *et seq*.). Union Pacific further asserts that ICCTA preempts any common carrier passenger obligation that exists under the laws of the state of Illinois. *Id.* at ¶ 34.

With regard to the STB's jurisdiction, Union Pacific alleges: (i) "[t]he transportation at issue in this case would be provided over lines that are part of Union Pacific's interstate rail network," and is within the [STB]'s jurisdiction; (ii) ICCTA grants the STB exclusive jurisdiction over "transportation by rail carriers" and "the remedies" provided in Subtitle IV, Part A ("RAIL") of Title 49 United States Code; and (iii) STB jurisdiction broadly preempts any common carrier passenger obligation imposed under state law. *Id.* at ¶¶ 29-30, 34.

## III. LEGAL DISCUSSION

### A. Primary Jurisdiction, Generally

Under the doctrine of primary jurisdiction, courts may defer certain matters to a public agency, such as the STB, that has specialized knowledge about a complicated area of law. "The doctrine seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within a regulatory regime." *Pharmaceutical Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 673 (2003) (internal citations omitted). The doctrine applies when "a claim is originally cognizable in the courts and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an

administrative body." *Ill. Bell Tel. Co., Inc. v. Global Naps Ill., Inc.*, 551 F.3d 587, 594 (7th Cir. 2008) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956)).

The benefits of the doctrine are clear: (1) it promotes consistency and uniformity, particularly where the development of the law is dependent upon administrative policy; (2) it allows uniquely qualified administrative agencies to handle certain complex areas not within the conventional expertise of courts; and (3) it serves judicial economy by permitting agencies to fully resolve disputes and thereby obviate the need for court intervention. *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991). "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case, the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956).

The Seventh Circuit has held that, when reviewing "the purposes of the statute involved and the relevance of administrative expertise to the issue at hand, the court ought to defer initially to the administrative agency." *Ryan*, 935 F.2d at 131 (quoting *Bradford Sch. Bus Transit v. Chicago Transit Auth.*, 537 F.2d 943, 949 (7th Cir. 1976)). The Seventh Circuit has also cited with approval the Second Circuit's observation that referral to the appropriate administrative agency is appropriate when a case raises issues "extending beyond the conventional experience of judges or falling within the realm of administrative discretion to an administrative agency with more specialized experience." *See Arsberry v. Illinois*, 244 F.3d 558, 563 (7th Cir. 2001) (quoting *National Comm. Ass'n, Inc. v. AT&T Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995)).

## B. The STB has Primary Jurisdiction in Matters Involving Common Carrier Obligations Under ICCTA.

Courts regularly recognize the specialized experience required to regulate railroads and invoke primary jurisdiction in dismissing or staying cases involving the Interstate Commerce Act

4

("ICA") and later ICCTA. As demonstrated below (*supra* at § III.B(3)), this is often done regarding the common law, now statutory, doctrine of the "common carrier obligation"—the requirement that specially-chartered, regulated entities provide service to the public upon reasonable request.

Here, deference to the STB's primary jurisdiction is especially warranted. Union Pacific's allegations engender: (1) complicated questions of first impression under ICCTA; (2) a need for historical understanding of the common carrier obligation as it has existed under common law, the ICA, and ICCTA for more than 150 years, the changes and additions effectuated by federal and state legislatures, courts, and agencies throughout that period, including the legislative history of various railroad statutes to the extent required due to any textual ambiguities, and STB jurisprudence fundamental to the resolution of the issues; (3) questions, and fact-specific inquiries regarding the scope of federal jurisdiction, remedies, and preemption, as to which the STB has unique, Congressionally sanctioned expertise; and (4) a need for resolutions that will contribute to a uniform national railroad policy.

      **1.**      **The History of the Federal Legislation Regulating Common Carrier Obligations.**

The Interstate Commerce Act ("ICA"), enacted in 1887, created the Interstate Commerce Commission ("ICC"). 104 S. Rpt. 176, at 2 (1995). The ICA "codified the common-law obligations of railroads as common carriers." *American Trucking Ass'ns. v. Atchison, T. & S. F. R. Co.*, 387 U.S. 397, 406 (1967). The ICC explained the common carrier obligation as follows: "The privately-owned railroad, as a "common carrier" in the broadest sense of that term, bears an initial obligation to provide service to all segments of the public, both freight and passenger, as the public may require and may be willing to pay for on a reasonable basis. This general obligation, by which the railroad may fairly be characterized as a quasi-public utility, can be

1026844\305325490.v1

nullified only by an Act of Congress." *New York, N.H. & H. R. Co.—Discontinuance of Trains*, 327 ICC 151, 220 (1966). *See also Decatur County Comm'rs v. Surface Transp. Bd.*, 308 F.3d 710, 715 (7th Cir. 2002) (railroads "may not refuse to provide service merely because to do so would be inconvenient or unprofitable"); *Pejepscot Industrial Part, Inc., d/b/a Grimmel Industries—Petition for Declaratory order*, Docket 33989 (STB served May 8, 2003) ("a carrier must adhere to its statutory obligations even if it suffers hardship in so doing"). Over the years, Congress has refined the statutes that regulate the interstate rail network, but it has always reaffirmed the statutory common carrier obligation. *See Nat'l Grain & Feed Ass'n v. United States*, 5 F.3d 306, 309–10 (8th Cir. 1993); 49 U.S.C. § 11101 (current codification of common carrier obligations).

In 1958, Congress passed the Transportation Act and charged the Interstate Commerce Commission, which had long had the power to enforce the common carrier obligation by requiring a carrier to provide service, with federal regulatory oversight of whether a carrier could discontinue intrastate and interstate common carrier service; these sections were later codified at 49 U.S.C. §§ 10908 and 10909. 49 U.S.C. §§ 10908-10909 (1994); Pub. L. No. 85-625.

In 1970, Congress enacted the Rail Passenger Service Act ("RPSA"), which created the National Railroad Passenger Corporation ("Amtrak"). 91 Pub. L. No. 518, 84 Stat. 1327. Under the RPSA, a railroad could relieve itself of the obligation to provide "intercity" passenger services by entering into a valid contract with Amtrak to preserve passenger service, rendering ineffectual § 10909 ICC discontinuance oversight under the Transportation Act with regard to intercity service. 84 Stat. 1334, § 401(a)(1). However, the relief from passenger common carrier obligations under the RPSA applied only to intercity rail passenger service, which excluded, among other things, commuter and other short-haul service in metropolitan and suburban areas,

6

usually characterized by reduced fare, multiple-ride and commutation tickets, and by morning and evening peak period operations. *Id.*, at 1328, § 102(5).

In 1995, Congress enacted ICCTA, eliminating the ICC and transferring its duties to the STB.[2] ICCTA confirms that "transportation" embraces the provision of facilities and services "related to the movement of passengers." 49 U.S.C. § 10102(9). The term "rail carrier" includes any "person providing common carrier railroad transportation for compensation" except "electric railways not operated as part of the general system of rail transportation." 49 U.S.C. § 10102(5).

Common carrier obligations for providers of rail transportation, as defined by ICCTA, are codified in several provisions of the United States Code. Under ICCTA, rail carriers shall provide "safe and adequate" transportation or service on reasonable request. 49 U.S.C. § 11101(a). ICCTA requires that rail carriers establish reasonable rates, rules, and practices on matters related to transportation or service. 49 U.S.C. § 10702. ICCTA further requires that rail carriers furnish adequate car service and establish, observe, and enforce reasonable rules and practices on car service. 49 U.S.C. § 11121(a)(1). These common carrier obligations are imposed upon any rail carrier, such as Union Pacific, "providing transportation or service subject to the jurisdiction of the Board under this part…" 49 U.S.C §§ 11101(a), 10702, 11121(a)(1).

"Congress does not further elucidate the requisites of the common carrier obligations, leaving to the Interstate Commerce Commission and the courts the task of clarifying, on a case-by-case basis, a more precise definition of 'reasonable request,' 'adequate car service,' and 'reasonable rules and practices.'" *Nat'l Grain & Feed Ass'n v. United States*, 5 F.3d 306, 310

---

[2] The STB is the successor to the former Interstate Commerce Commission (1887-1995) and was administratively aligned with—but still independent of—the executive agency of the U.S. Department of Transportation from 1996 to mid-December 2015. "The STB Reauthorization Act of 2015 established the STB as a wholly independent federal agency on December 18, 2015." https://prod.stb.gov/about-stb/

1026844\305325490.v1

(8th Cir. 1993). "The very complexities of [rail transportation] have necessarily caused Congress to cast its regulatory provisions in general terms. Congress has, in general, left the contents of these terms to be spelled out in particular cases by administrative and judicial action, and in the light of the congressional purpose to foster an efficient and fair national transportation system." *United States v. Pennsylvania Railroad Co*., 323 U.S. 612, 615–19 (1945) (upholding the ICC's authority to compel railroads to interchange their rail cars with water carriers despite the statute's silence on the subject, because the ICA is sufficiently broad to permit the ICC's interpretation).

### 2. Congress Endowed the STB with Jurisdiction in Recognition of the STB's Administrative Expertise.

The STB has jurisdiction over rail transportation by rail carrier "between a place in—(A) a State and a place in the same or another State as part of the interstate rail network. . . ." 49 U.S.C. § 10501(a)(2)(A). Within the interstate rail network, the STB has exclusive jurisdiction over:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

Where STB jurisdiction is exclusive, ICCTA and STB remedies preempt all conflicting laws. 49 U.S.C. § 10501(b).

Union Pacific's Complaint implicates numerous provisions of ICCTA. *See, e.g.,* 49 U.S.C. § 11101 (outlining the obligations of a rail carrier); 49 U.S.C. § 11707 (authorizing the STB to investigate and remedy a violation of the common carrier obligation in § 11101); 49 U.S.C. § 11704(c) (authorizing the STB to adjudicate a claim that a railroad breached its

common carrier obligation). As explained below, courts regularly invoke primary jurisdiction in referring to the STB cases involving an alleged breach of the common carrier obligation.

### 3. Courts Have Regularly Invoked Primary Jurisdiction in Cases Involving the Common Carrier Obligation.

As explained further below (*infra* at § B.4(c)), the common carrier obligation—and thus the primary jurisdiction of the STB—is a necessary adjunct to transportation subject to the Board's jurisdiction. Union Pacific alleges the STB's jurisdiction over Union Pacific's provision of transportation on the lines at issue. See Complaint ¶ 29.

Union Pacific is necessarily subject to the common carrier obligation that ICCTA applies to *all* transportation—passenger and freight alike—within its jurisdiction, though questions abound as to the nature and extent of that obligation.

Congress codified its policy direction to the STB at 49 U.S.C. § 10101 and the STB relies on this direction in establishing a uniform regulatory scheme. *Louisville & Jefferson County Riverport Authority and CSX Transp. Inc. — Construction and Operation Exemption — In Jefferson County, Kentucky*, 4 ICC 2d 749, 754 (1988) ("The rail transportation policy is designed to guide the Commission in *all* of its regulation of the railroad industry") (emphasis in original). In light of the STB's near-complete authority over, and special expertise regarding, the national rail system, courts have routinely invoked the primary jurisdiction doctrine and referred matters to the STB. *See Elam v. Kansas City S. Ry. Co*., 635 F.3d 796, 809 (5th Cir. 2011) ("courts have repeatedly applied the judicial doctrine of 'primary jurisdiction' in the context of both the ICCTA and its predecessor statute, the Interstate Commerce Act").

Courts have specifically invoked primary jurisdiction in cases involving the common carrier obligation. For example, in *DeBruce Grain, Inc. v. Union Pac. R.R.*, 983 F. Supp. 1280 (D. Mo. 1997), DeBruce sought to prevent Union Pacific from cutting off the supply of rail cars

9

to DeBruce's grain elevators for loading despite DeBruce's reasonable request, an alleged violation of Union Pacific's common carrier obligations under 49 U.S.C. §§ 11101(a) and 11121(a)(1). Union Pacific argued that the district court should dismiss the case based on the doctrine of primary jurisdiction, and let the parties proceed before the STB. DeBruce argued that the STB's expertise was not required to interpret the terms of Union Pacific's Tariff (a published, quasi-contractual document that manifests how the common carrier will meet its obligation to supply rail cars). The court found that the STB had exclusive authority to impose remedies associated with rail car supply under sections 11101(a) and 11121(a)(1), and primary jurisdiction over the remaining claims, and dismissed the case without prejudice. *Id*. at 1283. On appeal, the Eighth Circuit determined the district court had "properly concluded that DeBruce's claim should be left to the STB in the first instance due to its greater expertise with rail policy and the need for a uniform response to maintain regulatory uniformity." *DeBruce Grain, Inc. v. Union Pac. R.R.*, 149 F.3d 787 (8th Cir. 1998).

Similarly, in *Pejepscot Indus. Park v. Me. Cent. R.R.*, 215 F.3d 195 (1st Cir. 2000), a shipper brought an action against a carrier alleging that the carrier violated the common carrier obligation under 49 U.S.C. § 11101(a) by failing to provide service upon reasonable request. The court referred the matter to the STB under the doctrine of primary jurisdiction because the STB's expertise "is clearly involved in the question of whether Guilford's actions constitute an unlawful refusal to 'provide. . . service on reasonable request'" and "referral to the STB will promote uniformity in the standards governing refusals to provide service." *Id*. at 205-06; *see also Greenville County Economic Development Corporation — Petition for Declaratory Order*, Docket No. FD 34487, (STB served July 27, 2005), [2005 WL 1767438 at *3] (citing *Pejepscot*

10

with approval and holding that "the Board has primary jurisdiction to determine whether a railroad's common carrier obligation has been met").

The common carrier obligation implicates nearly every railroad activity, even down to the precise method and terms of how a commodity should be transported. For example, in *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903 (8th Cir. 2015), the Eighth Circuit found that the STB had primary jurisdiction to determine whether a railroad's requirement to transport hazardous materials was reasonable and therefore required by the common carrier obligation under 49 U.S.C. § 11101(a) because the question involved the expertise of the STB. *Id*. at 911.

In addition to cases involving a refusal to provide common carrier service under § 11101(a), other cases involving the common carrier obligation have been found to be within the STB's primary jurisdiction. *See, e.g., Jones Truck Lines v. Williamhouse-Regency*, 1995 WL 453342, *9 (S.D.N.Y. July 31, 1995) (staying proceedings pursuant to the primary jurisdiction doctrine because, among other things, the ICC had primary jurisdiction to decide whether the plaintiff acted as a common carrier); *Riffin v. Surface Transp. Bd.*, 733 F.3d 340 (D.C. Cir. 2013) (STB's interpretation of the freight carriage obligations required under § 11101(a) was a permissible interpretation of the statute under *Chevron* deference); *Ill. Cent. R.R. v. S. Tec Dev. Warehouse, Inc.*, 1999 WL 519042, *2-3 (N.D. Ill. July 15, 1999) (question of tariff construction, as well as that of the reasonableness of the tariff, were within the primary jurisdiction of the STB); *Santa Cruz Regional Transportation Commission–Petition for Declaratory Order*, 2011 WL 3667482 (S.T.B.), *3 (STB addressed a request by the City of Santa Cruz that it issue a declaratory judgment that Santa Cruz would not become a common carrier as the result of a proposed transaction).

1026844\305325490.v1

Each of these cases involved an alleged violation of 49 U.S.C. §11101(a), or the reasonableness of a request or limitation imposed by the carrier, which also necessarily involves the foundational question of whether a common carrier obligation exists. There is no principled primary jurisdiction rationale distinguishing the STB's primary jurisdiction in the foregoing cases from the issues presented here by Union Pacific.

4. **The Novel Questions of Regulatory Authority Involved Here Are With the Primary Jurisdiction of the STB.**

Although there are cases holding, generally, that a court and an agency are equally well suited to answer questions of pure statutory interpretation, when the matter at issue requires a determination of the nature and scope of regulatory authority in a complex factual context, referral to the agency with primary jurisdiction is advisable in the same circumstances in which a court would afford *Chevron* deference to the agency's interpretation. *American Auto. Mfrs. Ass'n v. Massachusetts Dep't of Envtl. Protection*, 163 F.3d 74 (1st Cir. 1998). Referral of a question of statutory interpretation is particularly appropriate, for example, in construing undefined terms of art. *See Ill. Terminal R.R. Co. v. ICC*, 671 F.2d 1214, 1216 (8th Cir. 1982) (Courts "have long recognized that interpretation of terms of art is within the special province or primary jurisdiction of the ICC and therefore should, in the first instance, be decided by the ICC"); *In re Starnet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) (invoking primary jurisdiction and referring a matter to the Federal Communications Commission to clarify an ambiguity in the term "location" in the Telecommunications Act); *Union Pac. R.R. v. FMC Corp.*, 2000 WL 134010 (E.D. Pa. 2000) (STB referrals appropriate as to questions of tariff construction and the applicability of a tariff where the words in a tariff are used in a technical sense that is within the special expertise of the administrative agency; *Charvat v. Echostar Satellite, LLC*, 630 F.3d 459 (6th Cir. 2010) (the

1026844\305325490.v1

phrase "on behalf of" was a matter which necessitated FCC interpretation; thus, the court found that primary jurisdiction existed).

Courts have also held that the doctrine of primary jurisdiction may be invoked "if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).

### a. The nature and scope of Union Pacific's duty to provide passenger service after ICCTA implicates novel regulatory policy questions.

Union Pacific erroneously asserts that Congress, in enacting RPSA and ICCTA, intended to entirely eliminate federal regulation of passenger service. Complaint ¶ 31. Union Pacific cites a Conference Report that stated, in part, "regulation of passenger transportation is generally eliminated." Complaint ¶31 (citing H.R. Report No. 104-422, at 167 (1995)).

Union Pacific, however, cannot point to statutory language to support its claim. Moreover, the very STB case cited by Union Pacific at paragraph 32 of its Complaint contradicts its assertion: "ICCTA's legislative history shows that the Conference Committee considered, but then expressly rejected, complete elimination of Board jurisdiction over passenger transportation in favor of a more limited 'curtailment' of Board regulation of such transportation." *DesertXpress Enters., LLC - Petition for Declaratory Order*, FD 34914 (STB served May 7, 2010). As the STB also explained, the bill reported out of the Committee and ultimately enacted, "(1) explicitly retained the definition of 'transportation' in 49 U.S.C. § 10102(9)(A) (discussed above), which includes facilities and services solely for the movement of passengers; (2) expanded the statutory exception for local transit; (3) repealed the statutory sections regulating

passenger train discontinuance and special passenger rates—a significant reduction in (but not elimination of) the regulation of passenger transportation; and (4) clarified that the few 'local governmental authorities' providing 'mass transportation' that remain under STB jurisdiction may invoke 49 U.S.C. §§ 11102 and 11103 (governing access to terminal facilities of, and switch connections to, other carriers, respectively)." *Id.*

The STB in *DesertXpress* also observed that the text of ICCTA "supports the view that a passenger-only operation…is within the Board's jurisdiction." *Id.* at *9. If passenger operations which are interstate or are part of the interstate rail network are jurisdictional and common carrier obligations attach to all transportation subject to the STB's jurisdiction (*see, e.g.,* 49 U.S.C. § 11101), then there exists a common carrier obligation to passengers. The inquiry turns to the nature and scope of that obligation and of the STB's remaining authority to regulate passenger service. These are novel questions not yet raised in the post-ICCTA regulatory scheme and are uniquely within the expertise and province of the STB.

> ### b. Questions of jurisdiction under §10501(a)(2)(A) involve undefined terms, require agency expertise, and should be answered uniformly to serve the national rail policy.

Union Pacific asserts that the STB has jurisdiction over the transportation at issue. If, however, there are any remaining questions regarding the STB's jurisdiction, resolving them would involve complicated factual and regulatory determinations best suited to the STB. The STB "has primary jurisdiction to determine its own jurisdiction." *PCI Transportation, Inc. v. Fort Worth & Western Railroad Company*, Docket No. 42094 (STB served April 25, 2008) (citing *Burlington N. Inc. v. Chicago & N.W. Transp. Co.*, 649 F.2d 556, 558 (8th Cir. 1981)).

Union Pacific alleges that all of the UP Lines, including those operated entirely within Illinois, are part of its interstate rail network. Complaint ¶ 29. However, the phrase "part of the

14

interstate rail network" is undefined and ambiguous. *See DesertXpress Enters., LLC - Petition for Declaratory Order*, FD 34914 (STB served May 7, 2010) at *8 ("The [statute] does not define the term 'interstate rail network,' as used in § 10501(a)(2)(A), and so we have discretion to interpret the term in a reasonable manner.").

The STB has thrice had occasion to address certain jurisdiction and preemption issues arising under § 10501(a)(2)(A) in cases involving passenger service operated wholly within one state. As is evident in each of the three decisions below—with distinct facts yielding distinct outcomes based on various rationales—the STB brings its expertise to bear in identifying analogous circumstances, drawing distinctions, and applying its precedent to a create a cogent body of law that impacts its own jurisdiction and the scope of ICCTA preemption.

In *All Aboard Florida—Operations LLC and All Aboard Florida—Stations—Construction and Operation Exemption—in Miami, Fla. And Orlando, Fla*., Docket No. FD 35680 (STB served Dec. 21, 2012), the STB found that it lacked jurisdiction because the passenger service between Miami and Orlando did not connect with Amtrak or any other interstate passenger rail service, even if some of the passengers would make their trip an interstate journey by multimodal transportation. *All Aboard Florida* involved a new entry (not a historic service), it did not involve a freight carrier operating interstate service along the same tracks, and the matter was uncontested.

In *Cal. High-Speed Rail Auth.—Constr. Exemption—Merced, Madera and Fresno Cntys., Cal*., Docket No. FD 35724 (STB served June 13, 2013), the STB found that ICCTA preemption applied to a planned operation of an 800-mile high-speed rail corridor from San Francisco to San Diego because there would be "extensive connectivity" to enable passengers to connect with Amtrak trains to travel both within and outside California.

Lastly, in *Texas Central Railroad and Infrastructure, Inc. & Texas Central Railroad, LLC—Petition for Exemption—Passenger Rail Line Between Dallas and Houston, Tex*., Docket No. FD 36025 (STB served July 18, 2016), the STB found that its approval was not required for the construction and operation of a proposed rail line that would be constructed and operated entirely within the State of Texas because there were no concrete plans for through ticketing or direct connection to Amtrak or any other interstate passenger rail carriers.

In the instant action, the North Line is purely local intrastate service with the exception of a single station located in Kenosha, Wisconsin. The West Line and Northwest Line are both purely intrastate service, but Union Pacific also operates interstate freight service on these lines. The commuter service is currently operated pursuant to a contract with Metra, and, upon expiration of that contract, it may be operated by Union Pacific pursuant to its common carrier obligation. As in the three STB decisions described above, interpretation of the phrase "part of the interstate rail network" in this matter will require a fact-intensive inquiry within the primary jurisdiction and expertise of the STB. In addition, the resolution of these jurisdictional matters will influence the development of a uniform transportation policy. These considerations weigh in favor of referral to the STB. *See generally Hansen v. Norfolk & W. R. Co.,* 689 F.2d 707 (1982) ("The primary jurisdiction doctrine requires initial submission to the [STB] of questions that raise issues of transportation policy which ought to be considered by the [STB] in the interests of a uniform and expert administration of the regulatory scheme laid down by [the ICCTA]").

          **c.    What effect, if any, the repeal of certain regulatory authorities has on the nature and scope of other duties is a novel question of regulatory policy best suited to resolution by the STB.**

Union Pacific cannot point to any provision of ICCTA to support its position that Congress eliminated the federal common carrier obligation to passengers. As the STB has

16

determined (*supra* at § B.4(a)), by retaining movement of passengers in the definition of "transportation," Congress ensured that passenger service remained within the STB's jurisdiction over "transportation by rail carriers" between states or as part of the interstate network. 49 U.S.C. § 10501. Common carrier obligations attach to all rail carriers "providing transportation or service subject to the jurisdiction of the Board…" 49 U.S.C. § 11101. Even the legislative history that Union Pacific cites does not specifically address the common carrier obligation in relation to passenger service.

Relying on inferences drawn from legislative history and the repeal and addition of other sections, Union Pacific has conjured an imaginary limit on the STB's authority where none exists. In so doing, Union Pacific raises a novel question as to the relationship between certain regulatory duties and authorities (i.e. discontinuance regulations) and others (i.e. common carrier obligations). This is a question of regulatory policy with potentially broad implications that is especially suitable for STB resolution.

Union Pacific's specific allegations further demonstrate the wisdom of referral. Union Pacific misinterprets *dicta* from *DesertXpress* in arguing that the repeal of sections 10908 (intrastate discontinuance authority) and 10909 (interstate discontinuance authority) evinces Congressional intent to eliminate the common carrier obligation to passengers. *See* Complaint ¶ 32 (citing *DesertXpress Enters., LLC-Petition for Declaratory Order*, FD 34914 (STB served May 7, 2010) at *13). As explained above, this was not the STB's conclusion in *DesertXpress*. Moreover, Metra disagrees with Union Pacific's repeal-by-implication theory for additional reasons.

Congress continued to define transportation to include movement of passengers, and the obligations under section 11101 apply to rail carriers engaged in transportation. Union Pacific's

17

speculation about what Congress was thinking by repealing sections 10908 and 10909 cannot overcome the express language of section 11101.

In addition and in any event, a common carrier passenger obligation existed, and continued to exist in the absence of STB discontinuance authority. Congress created the statutory common carrier obligation in 1887, but no federal discontinuance authority for either freight or passenger service existed until the Transportation Act amended the ICA 71 years later. *See New Jersey et al. v. New York, Susquehanna, and Western R.R.* 372 U.S. 1, 5 (1962) ("To discontinue these trains before the enactment of §13a [the Transportation Act amendment to ICA], the railroads were required in all cases to seek authority from each of the States served. … the Commission could not permit partial discontinuance of service over a line of railroad, whether the line crossed state boundaries or not."). Given that rail carriers' common carrier obligation for passenger service antedates all federal discontinuance authority, there is no support for Union Pacific's proposition that the repeal of the passenger service discontinuance provisions in 1995 could, by implication, eviscerate an entirely independent statutory duty.

Rather, sections 10908 and 10909 were repealed seemingly based on a belief that they were no longer necessary. See H.R. Conf. Rep. No. 104-22, 164 ("rail passenger transportation today…is now purely local or regional in nature…"). A second possibility is that Congress viewed these sections to be redundant with section 10903, which prescribes the procedures to abandon any part of a railroad lines or discontinue the operation of all rail transportation over any part of a railroad line, whether freight or passenger. *See* 49 U.S.C. § 10903.

Further, Union Pacific's focus on discontinuance or "exit" procedures is misplaced. The question may be whether Union Pacific would be obligated to "enter" commuter rail service upon expiration of the PSA. In post-ICCTA decisions, the STB has held that it has jurisdiction

18

under section 10901 over "entrance" into passenger transportation in the form of approval of the construction and operation of passenger systems. S*ee, e.g., Boston Surface Railroad Co.—Pet. for Partial Exemption From 49 U.S.C. Subtitle IV*, 2016 WL 5904758 (STB); *DesertXpress Enterprises, LLC—Petition for Declaratory Order*, 2010 WL 1822102, *2.

Union Pacific does not allege an explicit repeal of the common carrier obligation to passengers. Nor does it offer a clear statement of Congressional intent to effectuate such a repeal. Instead, Union Pacific asks the Court to extrapolate from the repeal of the §§ 10908 and 10909 discontinuance procedures and vague intimations about a limited "curtailment" of passenger regulation and find that it is not subject to a common carrier obligation to Metra's passengers. Union Pacific also offers no indication as to whether Metra, or the passengers themselves, would be treated in the same manner as a shipper requesting new service or the restoration of a service once provided.

A resolution of the merits of these questions is for another day. For purpose of the instant motion, what is most important is that, although Union Pacific attempts to frame the issue as narrow and straight forward, its request for declaratory relief in fact raises myriad complicated regulatory and policy questions of first impression, that lie squarely within the primary jurisdiction of the STB.

## C. Dismissal Without Prejudice Based on the Doctrine of Primary Jurisdiction Will Promote Judicial Efficiency.

When an agency has primary jurisdiction, a court has discretion either to stay the case pending an STB determination or, if the parties would not be unfairly disadvantaged, dismiss the case without prejudice. *Reiter v. Cooper*, 507 U.S. 258, 269-70 (1993). A stay is in order when a party may be prejudiced by a dismissal, such as where the statute of limitations might expire. *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 223 (1966); *Hansen v. Norfolk &*

19

*W. R. Co.*, 689 F.2d 707 (7th Cir. 1982). However, dismissal is appropriate where there is no likelihood of prejudice and all of the relief sought in court can be obtained in an administrative forum or in an easily initiated suit subsequent to the administrative proceedings. *See DeBruce Grain, Inc. v. Union Pac. R.R.*, 149 F.3d 787 (8th Cir. 1998) (affirming dismissal and referral to STB because it did not disadvantage DeBruce and the STB's decision could be appealed to the district court); *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 911 (8th Cir. 2015) (same).

In the instant action, dismissal is especially appropriate. There is no risk of an applicable statute of limitations expiring because one has not yet accrued. Union Pacific seeks a declaration of rights and obligations relating to a period of time after a future, hypothetical cessation of service. The parties have both publicly stated that there will be no interruption of service. Further, if Union Pacific gets the contract structure it wants (*see* Complaint ¶4), the process of transitioning the operations and personnel would unfold over an extended period of time, well over one year. There are no statute of limitations or other delay concerns.

In addition, the STB has broad powers to resolve the issues that Union Pacific or any other party might raise regarding Union Pacific's duty to provide commuter rail service in the absence of a PSA. *See* 5 U.S.C. § 554(e); 49 U.S.C. § 721 (vesting the STB with broad authority to issue a declaratory order to terminate a controversy or remove uncertainty); *Union Pacific Railroad Company—Petition for Declaratory Order*, Docket 35219 (STB served June 11, 2009) (issuing declaratory order that Union Pacific had a common carrier obligation to establish and provide rates and service in response to request for transportation of hazardous materials). *See also* 49 U.S.C. §§ 1321 (granting the STB power to issue inquiries, reports, orders, subpoenas, and depositions), 10709 (granting the STB authority to review contracts), 11101 (vesting the STB with regulatory authority over operations), 11701 (vesting the STB with investigative,

20

judicial, and enforcement authority). Moreover, Congress has established a special appellate process for review of STB decisions. 28 U.S.C. §§ 2321-23, 2342; *see, e.g., Riffin v. Surface Transp. Bd.* (D.C. Cir. 2013) (reviewing a STB interpretation of common carriage duties under 49 U.S.C. § 11101 with *Chevron* deference). Thus, the STB can fully resolve the issues.

In view of the absence of any risk of prejudice and the probability of the STB resolving the entire controversy, this Court should dismiss the case without prejudice. To the extent of any sensitivity to timing, the Court could require the parties to initiate proceedings before the STB by a date certain. In the alternative to dismissal without prejudice, the Court should enter a stay pending the STB's resolution of the issues.

## IV. CONCLUSION

WHEREFORE, Defendant, Commuter Rail Division of the Regional Transportation Authority, d/b/a Metra, respectfully requests that this Court dismiss the case without prejudice, or in the alternative, stay the case pending the completion of proceedings before the Surface Transportation Board, and in either case grant such other relief as the Court deems appropriate.

Respectfully submitted,

**COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY, d/b/a METRA**

By: *[s]Adam L. Saper*

One of Its Attorneys

Robert T. Shannon
Adam L. Saper
Hinshaw & Culbertson LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinoi 60601
(312) 704-3000

21