# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 1:19-cv-07957 |
| v. ) | |
| ) | Honorable Jorge L. Alonso |
| THE REGIONAL TRANSPORTATION ) | |
| AUTHORITY AND ITS COMMUTER RAIL ) | Magistrate Judge Gabriel A. Fuentes |
| DIVISION, d/b/a METRA, ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Patricia Brown Holmes, Bar # 6194645
Sarah E. Finch, Bar # 6312797
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St., Ste. 2900
Chicago, IL 60602
Telephone: (312) 471-8745
pholmes@rshc-law.com
sfinch@rshc-law.com

David E. Schoenfeld, Bar # 6197020
Erika A. Dirk, Bar # 6329612
SHOOK, HARDY & BACON L.L.P.
111 S. Wacker Dr., 47th Floor
Chicago, IL 60657
Telephone: (312) 704-7700
dschoenfeld@shb.com
eadirk@shb.com

Joe Rebein (*pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
jrebein@shb.com

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

COUNTER-STATEMENT OF FACTS ........................................................................... 2

counter-statement OF LEGAL STANDARD ................................................................... 3

ARGUMENT ..................................................................................................................... 4

I.     Congress eliminated any common carrier obligation of Union Pacific to provide commuter passenger service on its lines after the PSA expires. .......................... 5

II.    With ICCTA, Congress did not restore the pre-1958 regulatory framework; it fully deregulated passenger train discontinuances. ............................................... 8

        A.     Congress eliminated any requirement that interstate freight railroads obtain STB permission to discontinue passenger trains. ......................... 9

        B.     Congress preempted any common carrier obligation to provide commuter passenger service under state law. ....................................................... 12

Conclusion ....................................................................................................................... 15

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*BNSF Ry. v. Cal. Dep't of Tax & Fee Admin.*,
    904 F.3d 755 (9th Cir. 2018) ................................................................................................9

*Boomer v. AT&T Corp.*,
    309 F.3d 404 (7th Cir. 2002) ................................................................................................3

*City of Auburn v. U.S. Gov't*,
    154 F.3d 1025 (9th Cir. 1998) ............................................................................................13

*City of Chi. v. United States*,
    396 U.S. 162 (1969) ..............................................................................................................6

*CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*,
    944 F. Supp. 1573 (N.D. Ga. 1996) ............................................................................5, 8, 13

*DHX, Inc. v. Surface Transp. Bd*,
    501 F.3d 1080 (9th Cir. 2007) ..............................................................................................9

*Ezell v. Kan. City S. Ry.*,
    866 F.3d. 294 (5th Cir. 2017) ...............................................................................................9

*Fayus Enters. v. BNSF Ry.*,
    602 F.3d 444 (D.C. Cir. 2010) .........................................................................................9, 13

*Nat'l R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*,
    470 U.S. 451 (1985) ..............................................................................................................7

*PCI Transp., Inc. v. Fort Worth & W. R. Co.*,
    418 F.3d 535 (5th Cir. 2005) ..............................................................................................13

*Southern Ry. Co. v. North Carolina*,
    376 U.S. 93 (1964) ...........................................................................................................5, 6

*Union Pac. R. Co. v. Chi. Transit Auth.*,
    647 F.3d 675 (7th Cir. 2011) ................................................................................................3

*Wedemeyer v. CSX Transp., Inc.*,
    850 F.3d 889 (7th Cir. 2017) ................................................................................................5

**Statutes**

49 U.S.C. § 10102 .......................................................................................................................7

49 U.S.C. § 10501 ...............................................................................................7, 8, 10, 13

49 U.S.C. § 10901 .................................................................................................................9

49 U.S.C. § 10903 ...............................................................................................................11

49 U.S.C. §§ 10908 and 10909 ..................................................................................... *passim*

49 U.S.C. § 11101 ...............................................................................................................10

ICC Termination Act of 1995 (ICCTA), 49 U.S.C. § 10101, et seq. .................................. *passim*

Illinois Commercial Transportation Law, 625 ILCS 5/18c-4207, 625 ILCS 5/18c-
    6301, 625 ILCS 5/18c-7101 ...................................................................................14

Interstate Commerce Act of 1887 .........................................................................................6

Public Act 84-617, § 8-508 (1986) .....................................................................................14

Public Utilities Act, 220 ILCS 5/8-508, 220 ILCS 5/3-105(a) ..........................................14

Rail Passenger Service Act of 1970 (RPSA), Pub. L. No. 91-518, 84 Stat. 1327 ............6

**Other Authorities**

11 Ill. Reg. 15034................................................................................................................15

*DesertXpress Enters., LLC – Pet. for Declaratory Order*, 2010 WL 1822102
    (STB 2010).....................................................................................................4, 9, 10

*Great Canadian Railtour Co. Ltd. d/b/a Rocky Mountaineer – Pet. for Exemption
    from 49 U.S.C. Subtitle
    IV*, No. FD 35851, 2015 WL 500095 (STB 2015) .............................................10, 11

*Minn. Commercial Ry. – Discontinuance of Trackage Rights Exemption – In
    Anoka, Hennepin, Ramsey, & Washington Ctys.,
    Minn.*, No. AD AB 882 2020 WL 2570149 (STB 2020)........................................11

H.R. Rep. No. 104-311 (1995)..............................................................................................8

H.R. Rep. No. 104-442 (1995)...........................................................................................7, 9

S. Rep. No. 104-176 (1995) ..................................................................................................7

U.S. Const. Article VI, cl. 2 ..................................................................................................3

## INTRODUCTION

In 1995, Congress completed five decades of deregulatory legislation intended to relieve interstate freight railroads of the obligation to provide common carrier passenger service. Through a series of legislative changes beginning during the Eisenhower era and culminating with the ICC Termination Act of 1995 (ICCTA),[1] Congress established a legal framework to allow freight railroads to discontinue common carrier passenger service without obtaining federal or state approval. In the face of this authority, Metra's motion asks this Court to turn back the regulatory clock. Metra asks the Court to imply a current regulatory requirement for Union Pacific to obtain approval from the federal Surface Transportation Board (STB) before Union Pacific may stop operating commuter trains on its Chicago-area rail lines—although there is no statutory basis for any such proceeding. Alternatively, Metra argues that Union Pacific would require approval from the State of Illinois. With ICCTA, however, Congress expressly preempted the states from imposing their own regulations on rail transportation.

Metra acknowledges that it is "the only commuter authority in the country" where interstate freight railroads provide commuter passenger service for the transit agency. ECF 84 at 1; ECF 85-1, ¶ 6. More than a year ago, Union Pacific advised Metra that it planned to exit that business after the parties' Purchase of Service Agreement (PSA) expired. Metra's insistence that an alleged common carrier obligation bars Union Pacific from ceasing to operate the commuter service has prevented the parties from reaching a new agreement enabling Metra to operate its own trains on Union Pacific's lines. That disagreement forms the sole legal issue now before this Court: "whether Union Pacific does or does not have common-carrier obligations to provide commuter passenger service under the ICCTA." ECF 62 at 4.

---

[1] Pub. L. No. 104–88, 109 Stat. 803.

## COUNTER-STATEMENT OF FACTS

Metra's statement of facts includes disputed assertions that have no bearing on the outcome of this matter. The material facts are straightforward and undisputed.

Union Pacific is an interstate freight railroad. ECF 64, ¶ 2; ECF 85, ¶ 2. It also operates commuter passenger service on three rail lines in the Chicago area as an independent contractor for the benefit of Metra. ECF 1, Ex. A § 2.01; ECF 64, ¶ 2; ECF 85, ¶ 5.

Metra owns the commuter trains that run on the Union Pacific commuter lines. ECF 64, ¶ 3; ECF 85, ¶ 9. Union Pacific employees operate and maintain the commuter trains for Metra and perform administrative functions, such as selling tickets and collecting fares. ECF 64, ¶ 3; ECF 85, ¶ 8. Union Pacific owns and maintains the track, bridges and signal systems, which it also uses in its interstate freight operations. ECF 64, ¶ 3; ECF 85, ¶ 11.

Union Pacific's participation in Metra's commuter rail service arose under a predecessor railroad—Chicago & North Western (CNW), which was merged into Union Pacific on October 1, 1995—and has its roots in the reorganization of Chicago-area transit service during the 1970s. ECF 64, ¶ 2; ECF 85, ¶¶ 19, 24, 25.

Union Pacific currently operates commuter rail service under the PSA. ECF 64, ¶¶ 2, 18; ECF 85, ¶ 7. The PSA took effect on January 1, 2010. ECF 1, Ex. A § 11.01. The parties have extended the PSA's term a number of times, and its term is now set to end on December 31, 2020. ECF 64, ¶ 26; ECF 77-9; ECF 85, ¶ 33.

Union Pacific and Metra have engaged in negotiations during the past two years to enter into a new agreement to replace the existing PSA. ECF 64, ¶ 26; ECF 77-3–9; ECF 85, ¶ 31. To date, the parties have been unable to reach a new agreement based, in part, on their disagreement about Union Pacific's legal obligations. ECF 64, ¶¶ 26, 27; ECF 85, ¶ 32.

2

Metra has contended that, in the event the PSA were to expire without a new agreement in place, Union Pacific could not cease operating commuter trains because, according to Metra, Union Pacific would have a common carrier legal duty to maintain commuter rail service after expiration of the PSA. ECF 64, ¶ 27.

Union Pacific has advised Metra that it has no legal obligation to maintain commuter rail service after expiration of the PSA and encouraged Metra to negotiate toward a resolution that transitions operation of Metra's commuter trains on Union Pacific's lines to Metra or another operator in an efficient, seamless and timely manner. ECF 64, ¶ 27.

To ensure continuity of Metra's commuter service, Union Pacific has assured Metra that it will continue to provide services covered by the PSA for specified periods following this Court's judgment on the common carrier question. ECF 77-11.

## COUNTER-STATEMENT OF LEGAL STANDARD

Union Pacific agrees with Metra's statement of the summary judgment standard. Metra, however, does not address the legal standard that applies to the preemption issue in this matter. The Supremacy Clause of the United States Constitution provides that the Constitution and laws of the United States are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Federal law thus "preempts state laws that interfere with, or are contrary to, federal law." *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) (internal quotation omitted). In determining preemption, courts look to Congress's intent in enacting the federal statute at issue. *Union Pac. R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011).

**ARGUMENT**

Union Pacific's planned discontinuance of operating Metra's commuter passenger service is not subject to federal regulation, and state regulation of that decision is preempted. Union Pacific is not subject to any common carrier legal obligation that would require it to operate commuter passenger service on its Chicago-area lines after the PSA expires. Metra concedes that ICCTA "'repealed the statutory sections regulating passenger train discontinuance and special passenger rates—a significant reduction in (but not elimination of) the regulation of passenger transportation.'" ECF 84 at 19 (quoting *DesertXpress Enters., LLC – Pet. for Declaratory Order*, 2010 WL 1822102, at *10 (STB 2010)). Metra also concedes that "'Congress's intent in ICCTA was to *broaden* the preemptive scope of STB regulation of railroad operations described in section 10501(b),'" *id.* (quoting *DesertXpress*, 2010 WL 1822102, at *10). Those railroad operations by definition include transportation of passengers. *See DesertXpress*, 2010 WL 1822102, at *9. Metra's concessions should end this case.

Metra tries to escape the consequences of its concessions by arguing that either the STB still retains authority over passenger train discontinuances or such authority must have reverted to the states. *See* ECF 84 at 18–21. Metra is wrong on both points.

Congress did not eliminate all federal regulation of passenger transportation, but it did eliminate the historical regulation relevant to this case. New railroads seeking to provide common carrier passenger service as part of the interstate rail network still must obtain permission from the STB, and the STB still can regulate aspects of passenger service while that service is being provided. Congress, however, ended federal regulation of passenger train discontinuances when it repealed former 49 U.S.C. §§ 10908 and 10909. *See DesertXpress*, 2010 WL 1822102, at *10. Metra does not and cannot identify any remaining statutory provision

4

granting the STB authority to regulate Union Pacific's planned discontinuance of operating Metra's commuter passenger trains.

Congress's deregulation of passenger train discontinuances also did not return regulatory authority to the states. When Congress repealed sections 10908 and 10909, it simultaneously (1) expanded the STB's *jurisdiction* over passenger service to include intrastate service, (2) made that jurisdiction *exclusive*, and (3) expressly *preempted* state economic regulation of railroads. "By preempting state regulation of railroad operations, and granting exclusive jurisdiction over the regulation of almost all aspects of railroad operations to the [STB], Congress remove[d] the ability of states to frustrate its policy of deregulating and reviving the railroad industry." *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1583 (N.D. Ga. 1996); *see also Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894 (7th Cir. 2017) ("Congress's intent in [ICCTA] to preempt state and local regulation of rail transportation has been recognized as broad and sweeping.") (quotation omitted).

## I. Congress eliminated any common carrier obligation of Union Pacific to provide commuter passenger service on its lines after the PSA expires.

Congress expressed its intent to relieve interstate freight railroads of the obligation to provide common carrier passenger service in a series of steps over five decades culminating with the passage of ICCTA. For the Court's convenience, Union Pacific briefly restates that chronology from its summary judgment memorandum below. *See* ECF 78 at 5–10.

Congress took the first step in the Transportation Act of 1958.[2] Before 1958, the former Interstate Commerce Commission (ICC) could authorize a railroad to discontinue *all* service on a line, but it "lacked power to discontinue particular trains or services while leaving the remaining services in operation." *Southern Ry. Co. v. North Carolina*, 376 U.S. 93, 101 (1964). To

---

[2] Pub. L. No. 85-625, 72 Stat. 568.

discontinue only passenger operations, railroads needed permission from each of the states served. *See City of Chi. v. United States*, 396 U.S. 162, 164–65 (1969).[3] In 1958, "primarily concerned with the problems posed by [deficit-producing] passenger services," Congress gave the ICC authority to discontinue specific trains and services. *Southern Ry.*, 376 U.S. at 101. That authority was later codified at former 49 U.S.C. § 10908 (interstate service) and § 10909 (intrastate service).[4]

Congress took a second major step with the Rail Passenger Service Act of 1970 (RPSA).[5] RPSA allowed railroads to eliminate any obligation to provide intercity rail passenger service—*i.e.*, passenger transportation "except commuter and other short-haul service in metropolitan and suburban areas" RPSA § 102(5), 84 Stat. 1328—by transferring their responsibilities to Amtrak. Union Pacific, like most railroads, took up the option and was "relieved of all its responsibilities as a common carrier of passengers by rail in intercity rail passenger service." *Id*. § 401(a)(1), 84 Stat. 1334.

In 1995, Congress eliminated the vestiges of freight railroads' historical obligation to provide common carrier passenger service with ICCTA, a major piece of deregulatory legislation that abolished the ICC and transferred a reduced set of functions to the STB. Congress eliminated what remained of railroads' obligation to provide common carrier passenger service through two legislative changes:

---

[3] Metra is incorrect when it claims the Interstate Commerce Act of 1887 codified some sort of nationally uniform standard to govern issues relating to the discontinuance of common carrier passenger transportation. *See* ECF 84 at 7–8, 12–13. As Metra subsequently concedes, prior to 1958, states had exclusive jurisdiction over the discontinuance of all passenger trains. *See* ECF 84 at 18. Afterward, states retained jurisdiction to authorize passenger train discontinuances until Congress fully preempted their authority in ICCTA.

[4] ECF 88-1.

[5] Pub. L. No. 91-518, 84 Stat. 1327.

6

*First*, Congress repealed former 49 U.S.C. §§ 10908 and 10909. By repealing these provisions, Congress made clear that railroads could exit any common carrier passenger service without obtaining federal authorization. *Cf. Nat'l R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 455 n.7 (1985) (identifying former 49 U.S.C. §§ 10908 and 10909 as the sources of railroad obligations to provide common carrier passenger service).

*Second*, Congress granted the STB broad, exclusive jurisdiction over rail transportation to prevent state authorities from reregulating passenger discontinuances and otherwise frustrating its deregulatory policies. Congress specifically sought to ensure that "regulation of passenger transportation [was] generally eliminated." H.R. Rep. No. 104-442, at 167 (1995); *see also* S. Rep. No. 104-176, at 6 (1995) ("[N]othing in this bill should be construed to authorize States to regulate railroads in areas where Federal regulations have been repealed by this bill.").

Importantly, Congress specifically expanded the STB's jurisdiction to cover intrastate transportation. Before ICCTA, the ICC did not have general jurisdiction over *intrastate* transportation.[6] ICCTA gave the STB jurisdiction over "transportation by rail carrier," 49 U.S.C. § 10501(a)(1), *including* service related to "movement of passengers," *id.* § 10102(9), between "a State and a place in the same or another State as part of the interstate network," *id.* § 10501(a)(2)(A). Congress also made the STB's jurisdiction "exclusive." *Id.* § 10501(b). Congress reinforced that exclusivity by repealing a provision that had permitted states, under certain circumstances, to require carriers to provide intrastate service.[7]

Congress removed other possible avenues for state interference with its deregulatory objectives through ICCTA's express preemption clause. ICCTA's preemption clause provides

---

[6] *See* former 49 U.S.C. § 10501(b)(1). ECF 88-1.
[7] *See* former 49 U.S.C. § 10501(c). ECF 88-1.

7

that "the remedies provided under this part with respect to regulation of rail transportation are *exclusive* and *preempt* the remedies provided under Federal or State law." 49 U.S.C. § 10501(b) (emphasis added). Congress made these changes "to reflect the direct and complete preemption of State economic regulation of railroads," H.R. Rep. No. 104-311, at 95 (1995), and it thereby "remove[d] the ability of states to frustrate its policy of deregulating and reviving the railroad industry." *CSX Transp.*, 944 F. Supp. at 1583.

## II. With ICCTA, Congress did not restore the pre-1958 regulatory framework; it fully deregulated passenger train discontinuances.

Metra twists history into a knot, arguing that Congress's repeal of sections 10908 and 10909 did not free railroads to exit common carrier passenger service without obtaining STB authorization—but instead restored the pre-1958 status quo. According to Metra, the CNW and Union Pacific missed their window by not seeking the authority to exit passenger service before ICCTA became effective: "If the CNW or its successor UP wished to relinquish the common carrier obligation, they had a specific, passenger-oriented federal legal mechanism to seek authority to discontinue the obligation to provide commuter rail passenger service on the UP Lines *until late 1995*. Yet neither railroad sought authority to do so …. Thus, the passenger common carrier obligation persisted." ECF 84 at 9 (emphasis added). If Metra were correct, Union Pacific would be in the same position now as a railroad before 1958—*i.e.*, unable to discontinue passenger trains without (i) obtaining STB authority to discontinue all service on the lines, or (ii) obtaining state authority to discontinue passenger service. Congress, however, did not turn back the clock. With ICCTA, Congress went a different direction entirely by removing all remaining federal barriers to passenger train discontinuance and at the same time expressly precluding states from stepping into any such regulatory role.

8

A. **Congress eliminated any requirement that interstate freight railroads obtain STB permission to discontinue passenger trains.**

ICCTA's legislative history establishes that Congress intended to generally eliminate STB regulation of passenger transportation. One way Congress did so was to "repeal[] the statutory sections regulating passenger train discontinuance." *DesertXpress*, 2010 WL 1822102, at \*10. Metra's interpretation of the section 10908 and 10909 repeals as making it more difficult for railroads to discontinue passenger trains is diametrically opposed to Congress's express intent in passing ICCTA that "regulation of passenger transportation is generally eliminated." H.R. Rep. No. 104-442, at 167. Such an interpretation also is inconsistent with uniform recognition that "ICCTA continued a decades-long trend of deregulating railroads," *BNSF Ry. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018), and that Congress's purpose was "to build[] on the deregulatory policies that have promoted growth and stability in the surface transportation sector, and specifically, to implement a [f]ederal scheme of minimal regulation for this intrinsically interstate form of transportation." *Ezell v. Kan. City S. Ry.*, 866 F.3d. 294, 804 (5th Cir. 2017) (quotations omitted); *see also, e.g.*, *Fayus Enters. v. BNSF Ry.*, 602 F.3d 444, 450 (D.C. Cir. 2010) ("The ICCTA, to be sure, altered the context slightly, but entirely in a deregulatory direction . . . ."). Adopting Metra's position "would be inconsistent with the history and purposes behind the enactment of the ICCTA and the trend toward deregulation which it represents." *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1091 (9th Cir. 2007).

Metra correctly observes that the STB retains certain regulatory authority over passenger transportation, but the retained authority is not relevant here. The STB still has authority over passenger service where railroads affirmatively seek to provide transportation within the STB's jurisdiction. *See, e.g.*, *DesertXpress*, 2010 WL 1822102, at \*14 ("Congress retained after ICCTA the requirement in 49 U.S.C. § 10901 that a person must obtain authority to construct and

9

operate a railroad line that will be used to transport passengers in interstate commerce . . . .").[8] While a railroad acts as an STB-authorized common carrier of passengers, it is obligated to "provide the transportation or service on reasonable request." 49 U.S.C. § 11101(a). Metra cites several cases stating this undisputed proposition.[9] With ICCTA, however, Congress granted freight railroads *unrestricted* permission to *exit* the passenger business by specifically repealing "the statutory sections regulating passenger train discontinuance." *DesertXpress*, 2010 WL 1822102, at *10.

Metra also ignores critical distinctions when it claims "the STB implicitly confirmed it retained full authority to regulate all aspects of service provided by a rail passenger operator." ECF 84 at 9. As Metra observes, in exempting Rocky Mountaineer, a passenger-only railroad, from all post-ICCTA regulatory requirements, the STB said the exemption was justified because, among other things, it would "allow[] Rocky Mountaineer to enter and exit passenger routes without the need for regulatory approval." *Great Canadian Railtour Co. Ltd. d/b/a Rocky Mountaineer – Pet. for Exemption from 49 U.S.C. Subtitle IV*, No. FD 35851, 2015 WL 500095, at *4 (STB 2015). The STB was not actually addressing a request to exit a "passenger route," so we cannot say for certain how the agency would reconcile its statement with its recognition that Congress "repealed the statutory sections regulating passenger train discontinuance." *DesertXpress*, 2010 WL 1822102, at *10. However, the STB likely understood the two issues were different. Rocky Mountaineer did not operate both freight and passenger service on its

---

[8] The STB also has jurisdiction in a narrow range of cases where local governmental authorities meeting certain other qualifications seek the STB's assistance. *See* 49 U.S.C. § 10501(3)(B).

[9] Contrary to Metra's incorrect claim, Union Pacific does not contend that Congress's repeal of sections 10908 and 10909 created an implied "amendment to 49 U.S.C. § 11101." ECF 84 at 12. The requirements of § 11101 apply as long as railroads provide common carrier passenger service, but they do not obligate railroads to provide such service when Congress has given railroads permission to exit the business, as it did in ICCTA.

10

lines; it did not even own its own lines. Rather, Rocky Mountaineer operated "excursion trains, using Amtrak train and engine crews, on any rail line where the host carrier will allow it to operate." *Great Canadian*, 2015 WL 3500095, at *4. In this context, the STB's statement regarding the need for approval to exit "passenger routes" likely reflected the agency's view that Rocky Mountaineer's cessation of service on a "passenger route" would be a discontinuance of the railroad's "operation of all rail transportation" over a line—which is subject to regulation under 49 U.S.C. § 10903(a)(1)(B).[10] By contrast, Union Pacific's exit from the Chicago-area commuter business would not constitute a discontinuance of "operation of all rail transportation" on Union Pacific's lines because, as Metra acknowledges, those lines "are also used for freight services." ECF 85, ¶ 11.

In support of its position, Metra also cites a 1978 grant agreement with Union Pacific's predecessor, CNW, which states that if no service agreement were in effect during the period of time while any improvements associated with the grant agreement were in use, then CNW would provide commuter rail service "in accordance with its common carrier obligations." ECF 84 at 13. Metra's argument and the grant language, of course, merely beg the question of what historical common carrier obligations, if any, would have applied to govern CNW's conduct at the time. Moreover, whatever common carrier obligations CNW may have had in 1978, those obligations are not relevant to the question presented here: Whether Union Pacific *currently* has a common carrier legal obligation to operate Metra's commuter passenger trains after the expiration of the PSA. The answer to *that* question is clear as a matter of law: ICCTA eliminated

---

[10] Where one railroad has granted a second railroad rights to operate over the first railroad's line, the second railroad needs STB authority under § 10903(a)(1)(B) to discontinue those operations, even if the first railroad will continue to operate over the line. *See, e.g.*, *Minn. Commercial Ry. – Discontinuance of Trackage Rights Exemption – In Anoka, Hennepin, Ramsey, & Washington Ctys., Minn.*, No. AD AB 882 (SUB-4X) 2020 WL 2570149 (STB 2020).

11

federal regulation of passenger service discontinuances and preempted any state law purporting to regulate transportation provided by interstate railroads.

There is a final note worth making on this point. Metra devotes much of its statement of facts and memorandum to the business economics of the PSA and public investments made in Union Pacific's rail lines on which Metra's commuter passenger service operates. *See* ECF 84 at 4–5, 12–14; ECF 85, ¶¶ 27–30, 39–42.[11] It is certainly correct that passenger revenues do not cover the costs of operating Metra's commuter service, which requires public subsidies. *See also* ECF 77-1 at 16–17. It is also true that state and federal funds have been spent to improve Union Pacific's rail lines on which Metra's service operates. Metra, however, has provided no authority for the proposition that past public subsidies required for the operation of its commuter service under various iterations of the PSA or capital investments, which were made for the benefit of Metra's service, somehow create a common carrier legal obligation that would require Union Pacific to continue to operate that service in the future. Union Pacific is aware of none.

### B. Congress preempted any common carrier obligation to provide commuter passenger service under state law.

Metra's theory that passage of ICCTA returned regulation of passenger train discontinuances to the pre-1958 status quo is wrong for a second reason: ICCTA did not return regulatory authority to the states. ICCTA gave the STB *exclusive* jurisdiction over passenger transportation by interstate freight railroads and expressly *preempted* state regulation of rail transportation within the STB's jurisdiction. 49 U.S.C. § 10501(b).

Metra begins by misstating the regulatory status of Union Pacific's current commuter service operations on Metra's behalf. Metra asserts that Union Pacific is "providing service

---

[11] Metra's summary judgment memorandum also improperly references and relies on allegations from Metra's proposed Counterclaim (ECF 67-1), which this Court has not granted Metra leave to file at this time. *See* ECF 84 at 13–14, referencing ECF 67-1, ¶¶ 39, 44.

12

pursuant to a long-standing common carrier obligation." ECF 84 at 1; *see also* ECF 84 at 11 ("UP cannot unilaterally walk away from a 150-year old service obligation."). Union Pacific, however, indisputably is "an independent contractor for the benefit of [Metra]." ECF 64, ¶ 2; ECF 1, Ex. A § 2.01. In these circumstances, the STB has no jurisdiction over Union Pacific—or over Metra for that matter. Each is treated as a "local governmental authority," 49 U.S.C. § 10501(c)(1)(A),[12] and the STB has no general jurisdiction over "public transportation provided by a local government authority," *id.* § 10501(c)(2)(A). Metra concedes that any Illinois common carrier obligations would not apply when "a carrier has a contract with RTA." ECF 84 at 22.

Metra is simply wrong when it claims the Illinois Commerce Commission would have jurisdiction to regulate Union Pacific's discontinuance of passenger service if the STB does not. *See* ECF 84 at 21–22. ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation." *Ass'n of Am. Rs. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010) (quotations omitted). Its "'scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive.'" *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 544–45 (5th Cir. 2005) (quoting H.R. Rep. No. 104-311, at 95–96). Congress's deregulatory efforts in ICCTA were emphatically "not, as [Metra] would have [this Court] believe, an invitation to states to fill the regulatory void created by federal deregulation." *Fayus Enters.*, 602 F.3d at 450; *see also City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1030 (9th Cir. 1998) ("It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations.") (quotation omitted); *CSX Transp.*, 944 F. Supp. at 1582–85 (ICCTA preempts state regulation of railroad agency closings, even though the STB does not regulate agency closings).

---

[12] Under the PSA, Union Pacific acts as a "local government authority" because it "contracts with the local governmental authority to provide transportation service." *Id*. § 10501(c)(1)(A)(ii).

13

Illinois law does not authorize the Illinois Commerce Commission to regulate passenger train discontinuances in any event.[13] The Illinois Commercial Transportation Law acknowledges that its provisions regulating rail carriers do not apply where they have been preempted "by valid provisions of the Staggers Rail Act of 1980 or other valid federal statute, regulation, or order." 625 ILCS 5/18c-7101. The Commercial Transportation Law also does not require railroads to obtain permission to discontinue operations. Metra points to a provision requiring railroads to "'provide adequate service to the public at reasonable rates without discrimination.'" ECF 84 at 21 (quoting 625 ILCS 5/18c-7202). But even if that provision were not preempted by ICCTA, it would merely regulate railroads that assume common carrier obligations, but would not preclude them from discontinuing passenger trains.

Decades ago, the Illinois Commerce Commission was authorized under state law to regulate abandonment and discontinuance of service by any "public utility," Pub. Act 84-617, § 8-508 (eff. Jan. 1, 1986), including railroads, *see id.* § 12-101. But the Commission no longer has such authority over railroads. Under the Public Utilities Act, the Commission has authority to regulate discontinuances of service by certain "public utilities," *see* 220 ILCS 5/8-508, but not railroads, *see* 220 ILCS 5/3-105(a). Under the Illinois Commercial Transportation Law, the Commission has authority to regulate discontinuances of service by household goods carriers, *see* 625 ILCS 5/18c-4207, and motor common carriers of passengers, *see* 625 ILCS 5/18c-6301, but it has no comparable authority regarding rail carriers. The Illinois Commerce Commission's

---

[13] Metra also does not explain how the Illinois Commerce Commission would have jurisdiction over Union Pacific's discontinuance of trains on the UP North Line, which operates to and from Kenosha, Wisconsin. ECF 85, ¶ 5. ICCTA preemption of state regulations eliminated precisely this type of multi-jurisdictional barrier to passenger train discontinuances.

14

regulations governing discontinuance of passenger trains, formerly codified in Part 1540 of Title 92, were repealed in 1987. *See* 11 Ill. Reg. 15034 (eff. Oct. 1, 1987).[14]

## CONCLUSION

For these reasons, the Court should deny Metra's motion for summary judgment. The Court should grant Union Pacific's motion for summary judgment and declare that Union Pacific has no common carrier legal obligation to provide commuter passenger service on its lines after expiration of the PSA between Metra and Union Pacific.

Dated: October 30, 2020

Respectfully submitted,

/s/ *Patricia Brown Holmes*
Patricia Brown Holmes, Bar # 6194645
Sarah E. Finch, Bar # 6312797
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St., Ste. 2900
Chicago, IL 60602
Telephone: (312) 471-8745
pholmes@rshc-law.com
sfinch@rshc-law.com

David E. Schoenfeld, Bar #6197020
Erika A. Dirk, Bar #6329612
SHOOK, HARDY & BACON L.L.P.
111 S. Wacker Dr., 47th Floor
Chicago, IL 60657
Telephone: (312) 704-7700
dschoenfeld@shb.com
eadirk@shb.com

Joe Rebein (*pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
jrebein@shb.com

*Attorneys for Plaintiff*
*Union Pacific Railroad Company*

---

[14] *See* https://www.ilga.gov/commission/jcar/admincode/092/09201540sections.html.

15

**CERTIFICATE OF SERVICE**

I, undersigned counsel, certify that on October 30, 2020, I filed a copy of the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** electronically using the Court's CM/ECF system, which will generate notice of this filing to all counsel of record.

/s/ *Patricia Brown Holmes*