**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY,<br><br>Plaintiff<br><br>vs.<br><br>COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY, d/b/a METRA,<br><br>Defendant. | ) | Case No. 1:19-cv-07957<br>Judge Jorge L. Alonso<br>Magistrate Judge Gabriel Fuentes |

**DEFENDANT COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY'S MEMORANDUM IN OPPOSITION TO UP'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

Robert T. Shannon
Adam L. Saper
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60606
(312) 704-3000

Charles A. Spitulnik
KAPLAN KIRSCH & ROCKWELL LLP
1634 I ("Eye") Street NW, Suite 300
Washington, DC 20006
(202) 955-5600

*Counsel for the Commuter Rail Division of the Regional Transportation Authority d/b/a Metra*

Dated: October 30, 2020

## INTRODUCTION

In its Complaint, Union Pacific Railroad Company ("UP") asks this Court to address whether it has a common carrier obligation to operate the commuter passenger service it provides on the UP North, UP West and UP Northwest lines ("UP Lines"). The Commuter Rail Division of the Regional Transportation Authority ("Metra") has demonstrated in its Motion for Summary Judgment that the answer to UP's question is "yes." UP asserts, based on its erroneous view of its long-standing legal obligation, that it can stop providing commuter service – relied upon pre-COVID for 97,000 daily trips – on a whim. UP is wrong. It cannot. UP's Motion for Summary Judgment misinterprets legislation, legislative history and case law to support its incorrect assertion that it has no such common carrier obligation. Further, there is no support, i.e. no case law or legislative enactment, that eliminates the common carrier obligation. Since the states and the federal government codified the common carrier obligation and established procedures for terminating service provided pursuant to that obligation, railroads may not cease providing service that fulfills that obligation without approval from the applicable regulator. The Court must deny the relief requested by UP's Motion for Summary Judgment, confirm that it has that obligation and must comply with the applicable law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Metra relies for the purposes of this Reply on its Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue, ECF 85 ("SMF"), filed in conjunction with the Memorandum in Support of Motion for Summary Judgment, ECF 84 ("Metra Br.") on October 19, 2020. Metra is filling concurrently herewith, its response to UP's Statement of Material Facts.

## ARGUMENT

### I. CONTRARY TO UP'S UNSUPPORTED CONTENTION, NEITHER ICCTA NOR ANY OTHER LAW RELIEVED CNW OR UP OF THE COMMON CARRIER OBLIGATION TO PROVIDE COMMUTER RAIL PASSENGER SERVICE ON THE UP LINES

UP inherited from CNW a common carrier obligation to operate commuter service on the UP Lines. No change in the law, no legally sanctioned action by CNW, no legally sanctioned action by UP, nothing that has occurred at any time has altered that obligation. This Court should reject UP's assertions to the contrary. Surface Transportation Board ("STB") decisions and case law, *see* ECF 84, Metra Br. 8-9, demonstrate that Congress did not eliminate UP's common carrier obligation to provide commuter passenger service when it enacted the ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803 (1995) ("ICCTA"), ECF 78, UP Br. 4. Contrary to UP's claims, ICCTA's repeal of 1958 enactments did not grant railroads freedom from their obligations and was never intended to leave common carriage transportation of passengers unregulated. This novel theory is unsupported by Congressional enactments, legislative history, and the administrative decisions of the STB. UP's common carrier obligation with respect to commuter service remains despite the regulatory changes made by ICCTA.[1]

As discussed further, *infra* at 9-12, the repeal of the discontinuance statutes, previously codified at 49 U.S.C. §§ 10908, 10909, merely removed one remedy for seeking regulatory approval for passenger rail line discontinuances. The repeal did not relieve existing carriers of obligations in place—in this case for over one hundred years. Rather, the repeal streamlined regulations to mirror changes to regulatory structure as applied to railroads, which had arisen under

[1] Notwithstanding the reference in the PSA to UP as an "independent contractor," ECF 78, UP Br. 2, citing ECF 1, Ex. A § 2.01, UP has a primary obligation to provide the service. In 2019 alone, UP received a $98 Million in subsidies for that operation from Metra. ECF 85, SMF ¶ 30. Metra's role as subsidy provider and UP's role as service offeror remain the controlling factors here, with UP providing the service that fulfills its and its predecessors long-standing obligation to Chicago area commuters.

other new laws including the Rail Passenger Service Act of 1970, Pub. L. No. 91-518, 82 Stat. 1327 (1970) ("RPSA") and the Northeast Rail Services Act of 1981, Pub. L. 97-35, §§ 1133(2), 1137, 95 Stat. 643, 644-647 (1981) ("NERSA"). The fallacy of UP's argument is evident in the decisions it cites.

### A. ICCTA DID NOT GRANT INTERSTATE FREIGHT RAILROADS "UNRESTRICTED PERMISSION" TO LEAVE THE BUSINESS OF PROVIDING PASSENGER SERVICE

UP asserts that ICCTA "granted freight railroads *unrestricted permission* to leave the business of providing common carrier passenger service on their lines, thus eliminating any continuing obligation to provide common carrier passenger service." ECF, 78, UP Br. 6 (emphasis added). UP is wrong. Congress never intended to allow a railroad to walk away from a passenger service that, pre-COVID provided 97,000 passenger trips per day, without consequence or oversight.[2]

After ICCTA, the STB reviewed its jurisdiction over passenger rail in *DesertXpress Enters., LLC—Petition for Declaratory Order*, STB Finance Docket No. 34914 (Service Date May 7, 2010). The STB held that "there was "no basis for concluding that Congress [] anticipated and carved out—much less eliminated—from the scope of the [STB]'s jurisdiction any and every other form of interstate passenger operations that might arise in the future as part of the nation's general system of rail transportation." Slip op. at 14. The STB went on to hold that it had jurisdiction over new interstate passenger routes. *Id.* at 17.

As Metra noted in its brief, courts are reluctant to take action to repeal a statute based on implication only. ECF 84, Metra Br. 12 (citing *Rodriguez v. United States*, 480 U.S. 522, 524

[2] In a September 23, 2020 letter to Metra, UP confirmed its intent to phase out the services that UP provides on the UP Lines. Metra Response to UP's Statement of Material Facts, Second Harrison Affidavit, Exhibit A (*see also* UP Exhibit 11).

(1987) ("[R]epeals by implication are not favored, ... and will not be found unless an intent to repeal is clear and manifest") and *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)). If Congress intended to give railroads "unrestricted permission" to abandon their common carrier obligation for then-existing passenger routes, it would have done so explicitly in ICCTA or RPSA. ICCTA simply repealed portions of the code that were largely – but not completely – outdated based on other legislation, such as the RPSA, *see* ECF 84, Metra Br. 15. As the STB found in *DesertXpress*, ICCTA provided the STB with ongoing jurisdiction over passenger commuter rail at issue in this case. The STB recently reaffirmed its jurisdiction over passenger common carrier service in *Great Canadian Railtour Company Limited d/b/a Rocky Mountaineer — Petition For Exemption from 49 U.S.C. Subtitle IV*, STB Finance Docket No. 35851 (Service Date June 3, 2015) ("*Rocky Mountaineer*"); see ECF 84, Metra Br. 9-10.

In *DesertXpress*, the STB clarified that "[n]owhere in the statute or its legislative history has Congress defined the interstate rail network as essentially or exclusively freight-based." *DesertXpress Enters., LLC—Petition for Declaratory Order*, STB Finance Docket No. 34914, slip op. at 17 (Service Date May 7, 2010). To be sure, UP's common carrier commuter passenger rail service on the UP Lines is one of two remaining commuter rail services that rely on freight railroads.[3] But that uniqueness does not give UP the ability to decide unilaterally whether, when or how it will continue providing that service.

UP also relies on the Senate Conference report for the notion that through ICCTA, Congress sought to ensure that "regulation of passenger transportation [was] generally eliminated." ECF 78, UP Br. 8. UP cites the Senate Conference Report for the proposition that

[3] BNSF Railway also provides Metra service pursuant to a Purchase of Service Agreement. SMF ¶ 18. Pre-COVID, the BNSF line provided 55,000 passenger trips per day. Metra Response to UP's Statement of Material Facts, Harrison Affidavit.

"nothing in this bill should be construed to authorize States to regulate railroads in areas where Federal regulations have been repealed by this bill." *Id.* citing S. Rep. No. 104-176, at 6 (1995). Yet section 304 of the Senate Report also states:

> [T]his section would amend 49 U.S.C. 10501 -- which establishes jurisdiction over rail and pipeline transportation and intermodal rail-water or pipeline-water transportation -- in several respects. The exclusive nature of the Board's regulatory authority under Part A would be clarified (paragraph 1). The Board's rail jurisdiction would be limited to freight transportation (paragraph 2 and 4), because rail passenger transportation today (other than service by Amtrak, which is not regulated under the ICA) is now purely local or regional in nature and should be regulated (if at all) at that level.

S. Rep. No. 104-176, at 29. Thus, this legislative history supports the theory that the drafters intended the states to resume regulatory functions--a premise UP would certainly reject. UP cannot have it both ways.

### B. CASE LAW CITED BY UP IS NOT CONTROLLING OR ANALOGOUS TO THE METRA / UP DISPUTE

UP relies on several cases which only serve to bolster Metra's argument that UP's common carrier obligation on the line remains intact. For example, in *Chicago Southshore and South Bend Railroad – Petition for Declaratory Order – Common Carrier Obligation*, Finance Docket No. 31577, 1989 ICC LEXIS 366 (ICC Service Date Dec. 29, 1989), the railroad sought an exemption to acquire and operate a rail line in Illinois and Indiana. *Id.* at **1.* In its filings with the Interstate Commerce Commission ("ICC"), the railroad asked for a declaratory order confirming that Southshore's service obligation would be limited to providing freight transportation while a separate entity would provide passenger operations. *Id.* at *3. The ICC authorized Southshore's common carrier obligation to be limited to freight and, in so doing, wrote "[s]hippers on the line will recognize Southshore as the freight carrier; commuters will turn to the taxpayer-supported [other railroad] for passenger service." *Id.* Unlike *Chicago Southshore*, UP never sought authority

to operate only freight service when it acquired CNW. Instead, UP acquired the company and all of the obligations that it held at the time. *Union Pac. Corp., Union Pacific R. and Mo. Pac. R. —Control—Chi. & N.W. Holdings Corp. and Chi. & N.W. Transp. Co.*, Finance Docket No. 32133 (ICC filed Jan. 29, 1993), Application, Vol. 1, 124 ("UP-CNW would continue to work closely with METRA to handle both freight and commuter operations without undue interference to either."). CNW had not sought, and UP did not seek authority from the ICC in 1995 to discontinue commuter rail passenger service on the UP lines after the CNW acquisition. In contrast, Chicago Southshore petitioned the ICC, requesting relief from any passenger common carrier obligation. Instead, all UP has ever sought with respect to this commuter service is the substantial subsidy and funding for related capital infrastructure improvements that Metra continues to provide.

Metra agrees with UP's explanation that "[i]f a railroad assumes an obligation to provide common carrier freight or passenger service over a line, the obligation continues unless and until the railroad permissibly abandons the line or discontinues the service." ECF 78, UP Br. 5 *citing Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 455 n.7 (1985); *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 320 (1981). Yet, without authority UP asserts that CNW "had no federal common carrier obligation to provide passenger service when CNW merged with UP" in 1995, ECF 78, UP Br. 11. But that sentiment is contrary to UP's arguments that ICCTA relieved railroads of their obligations to seek ICC or STB authority to discontinue service *and* the well-established law on the acquisition of common carrier obligations. ECF 84, Metra Br. 14, *Groome & Assocs., Inc. and Lee K. Groome v. Greenville Cty Econ. Dev. Corp.*, STB Docket No. NOR 42087, slip op. at 10 (Service Date July 27, 2005) (when an entity acquired "full ownership of an active railroad" it "assumed a common carrier obligation"). It is also contrary to CNW's own express statement in the 1979 Grant Agreement in

which CNW agreed that "in the event no Service Agreement is in effect, [CNW] shall provide Commuter Rail Service over the Project Facilities in accordance with its common carrier obligation." SMF ¶ 20. UP assumed an obligation, has continued to receive substantial funding from Metra to support it, and never sought regulatory authority to cease those services. Accordingly, UP may not halt service on the UP Lines without regulatory approval.

## II. UP CANNOT CLAIM THAT FEDERAL PREEMPTION AFFORDS IT A MEANS TO ABANDON OR DISCONTINUE ITS COMMON CARRIER COMMUTER SERVICE ON THE UP LINES WITHOUT STB OR ILLINOIS AUTHORITY.

### A. THE FEDERAL COMMON CARRIER OBLIGATION HAS NOT BEEN REPEALED

As long as UP continues to hold a common carrier obligation to provide the commuter service on the UP lines, the broad scope of the STB's regulatory regime continues to govern its rights and obligations. 49 U.S.C. § 10501. The statute specifically states that "the remedies provided in this part are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). The remedy of abandonment or discontinuance of service is specifically addressed in 49 U.S.C § 10903. As long as the federal statute continues to include a section that governs the process for abandoning or discontinuing service on all or a portion of its lines, *see id.*, then UP may not unilaterally cease service that is part of its common carrier obligation.

To support its argument that any state regulation of its common carrier obligation is preempted, UP relies on a litany of cases that address the scope of federal preemption enjoyed by railroads. Railroads do indeed enjoy the benefit of broad preemption that frees them from burdensome and potentially inconsistent state-based regulations implicating interstate railroad transportation. *See* ECF 78, UP Br. 9, *citing CSX Transp. Inc. v. Georgia Pub. Ser. Comm'n,* 944 F.Supp. 1573, 1583 (N.D. Ga. 1996) (ICCTA preempted state regulatory authority over the closing

of local railroad offices known as "railroad agencies"); and *Wedemeyer v. CSX Transp. Inc.*, 850 F.3d 889, 894 (7th Cir. 2017) (plaintiffs' attempt to remove abandoned railroad tracks and take possession of underlying property were preempted under ICCTA). However, none of the cases cited by UP stand for the proposition that a railroad may unilaterally cease service based on federal preemption.

Rather the preemption cases cited by UP deal with state-level regulation of rail transportation that would interfere with railroad operations – specifically, with a railroad's ability to fulfill its common carrier obligation - in some way. *See e.g., id*. Indeed, Metra does not dispute UP's assertion that "Congress's intent in ICCTA to preempt state and local regulation of rail transportation has been recognized as broad and sweeping," ECF 78, UP Br. 9-10, *quoting Union Pac. R.R. v. Chi. Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011). However, neither ICCTA, nor any other legislation regarding passenger rail obligations, such as RPSA, relieved UP of its obligation to provide commuter service on the UP lines.

UP does not provide this Court with any authority that addresses the unique situation in which UP and Metra find themselves. No court or legislative enactment has eliminated an existing passenger rail common carrier obligation – either intercity or commuter – under a theory that ICCTA preempts state common carrier obligations. Preemption does not itself provide any relief—rather it requires UP to seek relief from the STB pursuant to § 10903. If state law is preempted, as UP contends, then the STB's jurisdiction remains and UP must seek authority in order to cease service. The existence of preemption does not provide an avenue for relief for UP. It only dictates which law would govern – the U.S. Code.

## B. IF THE FEDERAL OBLIGATION DOES NOT EXIST, ILLINOIS LAW GOVERNS THE OPERATION OF COMMUTER SERVICE ON THE UP LINES

For ten pages of its twelve page brief UP attempts to preoccupy the Court with the asserted negative implication that the 1996 repeal of former 49 U.S.C. §§ 10908 and 10909 repealed any federal obligation to passengers—never mind that passenger service was expressly retained in the Board's regulatory responsibilities. 49 U.S.C. § 10101 (defining transportation subject to the Board's jursidiction as including "services . . . related to the transportation of passengers . . . "), or that the STB has specifically confirmed in *DesertXpress* that the agency retains jurisdiction over passenger operations provided by interstate carriers.

Assuming *arguendo* that the repeal of §§ 10908 and 10909 eliminated all federal passenger discontinuance authority, UP's argument fails for either of two reasons. First, the repeal of 49 U.S.C. §§ 10908 and 10909 means the STB does not have exclusive jurisdiction; there is no longer a requisite "remedy under this part" required to trigger federal preemption in the area of passenger discontinuance. 49 U.S.C. § 10501(b). And if, as UP contends, passenger transportation is not regulated under 49 U.S.C. Subtitle IV Part A (ECF 78, UP Br. 11), it would be particularly unclear what role the STB had to play in intrastate passenger operations such as UP largely performs in Chicago.

### 1. REPEAL OF SECTIONS 10908 AND 10909 REPEALED THE PREEMPTIVE JURISDICTION OF THE STB OVER DISCONTINUANCE REMEDIES

As UP must admit, the preemptive scope of STB jurisdiction is coextensive only with the remedies under Subtitle IV, Part A. UP Br. 9 ("The preemption clause *provides that the remedies provided under this part* with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.") (emphasis in original, citations and internal

quotations omitted). The effect of the premise is clear: if there are no remedies "under this part" (e.g., passenger service discontinuance remedies which have been repealed) then there is no exclusive jurisdiction.

This is amply demonstrated in UP's careful explanation of the history of former (now repealed) § 10908, which demonstrates how Congress, created—and later eliminated—the passenger discontinuance remedies of 49 U.S.C. Subtitle IV Part A. Section 10908 was enacted in 1958 as a federal process for receiving passenger train discontinuance authority. At the same time Congress created the exclusive jurisdiction of the Board over the remedies identified in Part A in 1996, it repealed the discontinuance process from Part A. That uniform process of discontinuance was, undoubtedly according to UP, a remedy in that it accorded federal relief from an obligation that impaired the railroad. UP Br. 10 (stating that Congress " . . . remov[ed] any requirement that railroads obtain STB permission to discontinue such service. . ."). Who then, holds control over the discontinuance remedy? UP is unabashed—"railroad management;" UP can remedially provide itself with self-help and discontinue service at will. UP Br. 10. But, as is evident from the Senate Report UP cites, that is not what Congress did, instead recording its intent that the discretion to regulate passenger transportation that is "local or regional in nature . . . should be regulated (if at all) at that level." S. Rep. 104-76. Nowhere did Congress ever say it should go unchecked.

Moreover, as UP's brief coyly acknowledges in a footnote with a less than complete citation, when Congress intended to exempt certain elements of railroading from both federal and state regulation, it did so by enacting a positive, express prohibition on regulation, as was the case for spur track. UP Br. n.6. The non-regulation of spur track is not a jurisdictional inference or negative implication absent from positive law, as UP would have the Court believe by omitting

the relevant statute. *Id.* Rather, Congress guarded against the idea that it was ceding spur track remdies to the states by enacting a law to that effect. Where Congress wanted to create regulatory gaps in ICCTA, it was very precise in doing so. Congress did not impliedly preempt or prohibit regulation by just repealing a law. *Compare* UP n.6 *with* 49 U.S.C. §§ 10501(b)(2) and § 10906.

Thus, when Congress desires that there be no remedy or regulation except those in Subtitle IV, Part A it has been abundantly clear, circumscribing from federal and state regulatory discretion spur track, labor, local government commuter service, and solid waste. *See gen.* 49 U.S.C. § 10906; 10501(c)(2). UP's argument is the opposite, contending that Congress treated regulatory authority differently within the same statute scheme. This is no premise from which to interpret the law. *Carcieri v. Salazar*, 555 US 379, 395 (2009) ("We have repeatedly stated ... that absent 'a clearly expressed congressional intention,' ... [a]n implied repeal will only be found . . . *where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'*") (emphasis supplied). Principles of statutory construction do not permit the Court to accept UP's guess that Congress intended to repeal passenger discontinuance authority by implication.

### 2. ILLINOIS LAW HAS FILLED ANY GAP IN THE REGULATORY SCHEME

If, as UP argues, the STB does not have jurisdiction because of the repeal of § 10908 and despite the continuing presence of § 10903, then Illinois law governs the termination by passenger railroad operators like UP of their common carrier obligation within the state. The STB, in *All Aboard Florida-Operations LLC and All Aboard Florida-Stations — Construction and Operation Exemption — In Miami, Fla. and Orlando, Fla.*, STB Finance Docket No. 35680, slip op. at 3 (Service Date Dec. 21, 2012) ("*All Aboard Florida*"), has confirmed that in circumstances where passenger service is wholly intrastate, it has no jurisdiction over that operation. Jurisdiction, is of course, fundamental to UP's Motion for Summary Judgment, UP Br., 8, although the question of

who has jurisdiction presents an attempt by UP to obscure the question it poses in its Complaint of whether it has a common carrier obligation. In *All Aboard Florida*, the Board determined that an intrastate, non-Amtrak, passenger service performed on interstate-connecting lines also used for freight was not part of the interstate rail network. If it is the case, as UP argues, that the ICCTA removed the STB's authority to regulate UP's provision of the commuter service on the UP lines, this Court would need to make a determination regarding the state common carrier obligation of UP as to service that is intrastate, non-Amtrak, and performed on interstate-connecting lines also used for freight. To the extent that the service on the UP Lines can be characterized as wholly intrastate, the STB's conclusion in *All Aboard Florida* that it is without jurisdiction in those circumstances does not support a conclusion that there is no common carrier obligation. It leads instead to the regulation of any attempt by UP to stop providing service on the UP Lines by the laws of the State of Illinois.

Section 10908 was introduced to remove state jurisdiction over passenger rail; by UP's theory (and despite the fact that § 10903 remains very much present), the law must return to the *status quo ante.* Any part of rail regulation not subject to federal preemption has been retained by the Illinois General Assembly and delegated to the Illinois Commerce Commission; UP gets no free pass. 625 ILCS 5/18c-7101. As set forth by Metra, ECF 84, Metra Br, 21-22, the only exception is where a railroad has an agreement with Metra. Accordingly, if, as UP argues, the STB has no authority to regulate the discontinuance of these operations, when the Purchase of Service Agreement between Metra and UP expires the Illinois Commerce Commission would have jurisdiction over the commuter service operated on the UP Lines. ECF 84, Metra Br. 22, *citing Regional Transp. Auth. v. Ill. Commerce Comm'n*, 455 N.E.2d 172, 175 (Ill. App. Ct. 1983) ("[T]he RTA has sole jurisdiction over the companies with which it has a contractual relationship,

but if the contractual relationship ends, jurisdiction reverts to the [Illinois Commerce Commission].")

As addressed in Metra's brief, the common carrier obligation dates back over one hundred years and grew out of state-level policies created to ensure that railroads would serve the communities they passed through without discrimination. ECF 84, Metra Br. 6-7 *citing Chicago & A. R. Co. v. People*, 67 Ill. 11, 17 (Ill. 1873) (Railroads, "[i]n accepting their charters, which gave them an artificial existence as common carriers, [] necessarily accepted them with all the duties and liabilities attached, by the existing law, to the function of a common carrier."). In Illinois, the common carrier obligation applied to railroads before the federal government codified the obligation. *Id.* The STB either has jurisdiction and 49 U.S.C. § 10903 governs or it does not; if it does not, Illinois has jurisdiction over the commuter operation and UP must seek approval from the State of Illinois to discontinue passenger service.

UP's service on the UP Lines cannot be discontinued merely because UP has decided the service is inconvenient, complex or unprofitable. There is no federal state legislative support for that proposition and no case law that supports UP's position.

**CONCLUSION**

For all of the reasons cited here and in Metra's Memorandum in Support of its Motion for Summary Judgment, Metra respectfully requests this court to deny UP's Motion for Summary Judgment and grant Metra's Motion.

Respectfully Submitted,

/s/ Charles A. Spitulnik

Robert T. Shannon
Adam L. Saper
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60606
(312) 704-3000

Charles A. Spitulnik
KAPLAN KIRSCH & ROCKWELL LLP
1634 I ("Eye") Street NW, Suite 300
Washington, DC 20006
(202) 955-5600