# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, ) <br> ) <br> Plaintiff ) <br> ) <br> vs. ) <br> ) <br> COMMUTER RAIL DIVISION OF THE ) <br> REGIONAL TRANSPORTATION ) <br> AUTHORITY, d/b/a METRA, ) <br> ) <br> Defendant. ) | Case No. 1:19-cv-07957 <br> Judge Jorge L. Alonso <br> Magistrate Judge Gabriel Fuentes |

### DEFENDANT'S REPLY TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Robert T. Shannon
Adam L. Saper
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60606
(312) 704-3000

Charles A. Spitulnik
KAPLAN KIRSCH & ROCKWELL LLP
1634 I ("Eye") Street NW, Suite 300
Washington, DC 20006
(202) 955-5600

*Counsel for the Commuter Rail Division
of the Regional Transportation Authority
d/b/a Metra*

Dated: November 6, 2020

## INTRODUCTION

The issue at the heart of this proceeding--the existence of the passenger common carrier obligation--may appear simple at first blush but it is not. It addresses a highly complex area of law and regulation, that lies on the boundary between Surface Transportation Board ("STB" or "Board") and court jurisdiction and between Federal and State powers and requires thorough review of years of history embodied in the Congressional directives that inform the answer to the question. Union Pacific Railroad Company ("UP") presents the case as a "straightforward issue of statutory interpretation," ECF 89, UP Response to Metra Motion for Summary Judgment ("UP Resp."), 1, but this misleads the Court because UP's argument does not credibly or accurately reflect the law.

UP cannot cloud the issue it raised in its Complaint – that is, whether it has a common carrier obligation with respect to the commuter service it provides on the UP North, UP West, and UP Northwest Lines ("UP Lines") – by arguing that federal remedies, or the asserted absence of them, present the conclusive arguments with respect to honoring its long-standing obligation and its threat to discontinue the service compelled by the presence of that obligation. If UP wanted a declaratory order on discontinuance remedies, it should have asked for one; instead it asked a different, threshold question relating only to the existence of a common carrier obligation

The larger discussion that UP presents, *i.e.*, that it is regulated by the STB and that it should be allowed to unilaterally relieve itself of the obligation to provide rail service without STB authorization is beyond the legal question presented in UP's Complaint. UP asks this Court to determine whether it has a common carrier obligation, and the answer to that question under the law and precedent is "yes." No statute, no ruling, no process, no regulation relieved Chicago & North Western Railway ("CNW") or its corporate successor, UP, from the obligation CNW

1

admitted in 1978 that it continued to hold with respect to the UP Lines. This Court should grant Metra's Motion for Summary Judgment, deny UP's Motion for Summary Judgment, and confirm that UP has a common carrier obligation on the UP Lines.

## STATEMENT OF FACTS

Metra relies for the purposes of this Reply on its Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue, ECF 85 ("SMF"), filed in conjunction with the Memorandum in Support of Motion for Summary Judgment, ECF 84 ("Metra Br.") on October 19, 2020, and Metra's Local Rule 56.1(a) Reply to UP's Local Rule 56.1(b) Response to Metra's Statement of Material Facts As To Which There Is No Genuine Issue, ECF 92, and Metra's Reply to UP's Response to Metra's Statement of Material Facts which Metra is filling concurrently herewith, its Reply to UP's Response to Metra's Statement of Material Facts.

## LEGAL STANDARD

UP incorrectly asserts that Metra "does not address the legal standard that applies to the preemption issue in this matter," ECF 89, UP Resp., 3, and suggests that Metra disputes the application of the Supremacy Clause, U.S. Const. art. VI, cl. 2. But this is little more than another attempt by UP to cloud the primary issue raised by its Complaint before the Court, and misapprehends Metra's arguments with respect to the general law of preemption. As discussed more fully below, *infra* at 12-13, UP cannot rely on the Supremacy Clause or the preemption standard articulated in 49 U.S.C. §10501 because neither of those doctrines controls this Court's determination about the continuing viability of UP's common carrier obligation.

UP opens its Responsive Brief with an assertion that Metra's reliance on *DesertXpress Enters., LLC — Petition for Declaratory Order*, STB Finance Docket No. 34914 (Service Date May 7, 2010), "should end this case." ECF 89, UP Resp. 4. *DesertXpress* is indeed controlling

precedent; however not with the result that UP presents. UP frames *DesertXpress* as providing it with relief in this case when, in fact, *DesertXpress* supports the STB's continued jurisdiction over the common carrier rail passenger obligation and the commuter service that forms the basis of this case. So too does *Great Canadian Railtour Company Limited d/b/a Rocky Mountaineer — Petition For Exemption from 49 U.S.C. Subtitle IV*, STB Finance Docket No. 35851 (Service Date June 3, 2015) ("*Rocky Mountaineer*")—which UP acknowledges this Court will need to confront in ruling on UP's motion. ECF 89, UP Resp., 10 (". . . we cannot say for certain how the agency would reconcile [the cases] . . .") (ceding the precedential value of *Rocky Mountaineer* as indicative of STB authority). There is no disputing the applicable law in this case – UP's common carrier obligation to provide commuter service on the UP Lines survives, and it requires UP to continue providing the service that, pre-COVID, was relied upon for 97,000 commuter trips each day.

## ARGUMENT

**I.    CONGRESS DID NOT ELIMINATE UP'S COMMON CARRIER OBLIGATION WITH RESPECT TO COMMUTER RAIL PASSENGER SERVICE ON THE UP LINES.**

UP's response reiterates its argument that legislative enactments--from the Transportation Act[1] to ICCTA--led to the implied repeal of its common carrier obligation on the UP Lines. ECF

---

[1] UP states:

> Metra is incorrect when it claims the Interstate Commerce Act of 1887 codified some sort of nationally uniform standard to govern issues relating to the discontinuance of common carrier passenger transportation. See ECF 84 at 7–8, 12–13. As Metra subsequently concedes, prior to 1958, states had exclusive jurisdiction over the discontinuance of all passenger trains. See ECF 84 at 18. Afterward, states retained jurisdiction to authorize passenger train discontinuances until Congress fully preempted their authority in ICCTA.

ECF 89, UP Resp., 6 n.3. Here again, UP attempts to conflate the common carrier obligation, passenger discontinuance statutes and preemption. To be sure, "[s]ection 1(4) of the [Interstate Commerce] Act, 49 U. S. C. § 1 (4), provides that it shall be the duty of common carriers by rail to provide transportation upon reasonable request therefor and to establish just and reasonable rates." *American Trucking Assos. v. Atchison, T. & S. F. Ry. Co.*, 387 U.S. 397, 406 (1967), see Metra Br. 7. At the same time, while the common carrier obligation was federally created, "States had exclusive jurisdiction over discontinuance of passenger trains." Metra Br. 18, citing *Napa Valley Wine Train Inc. — Petition for Declaratory Order*, 7 I.C.C.2d 954, 1991 STB LEXIS 195, *26-27 (Service Date July 18,

3

89, UP Resp. 5-8. However, Congress carefully drafted legislation, beginning with the Interstate Commerce Act of 1887, 49 U.S.C. § 3-22 (Suppl. 2 1925) (1887), to create a regulatory framework that would support interstate, intercity, commuter and freight rail, benefitting the commuting, traveling and shipping public. Nothing in the series of laws adopted by Congress relieved UP of its common carrier commuter passenger service obligation on the UP Lines. Despite UP's urging, this Court "cannot infer that Congress's silence is accidental in an area where Congress has already said so much out loud." *Useden v. Acker*, 947 F.2d 1563 (11th Cir. 1991).

If Congress intended to relieve UP of its obligation to provide commuter passenger service on the UP Lines, Congress could have explicitly done so. There is no federal law that allows UP to strip commuters of an established service relied upon by tens of thousands of people. Metra does not dispute that Congress adopted the Transportation Act of 1958, or the Rail Passenger Service Act, or ICCTA. ECF 89, UP Resp., 5-6. Yet the sum of these enactments does not equal relief from UP's common carrier obligation. None of these laws, not RPSA, not ICCTA, nor ICCTA's repeal of train or ferry discontinuance statutes, relieved UP of its obligation to provide service on the UP Lines. The mere existence of other statutes favorable to UP cannot be read to imply further relief to UP, particularly in light of continued STB supervision of discontinuance pursuant to 49 U.S.C. § 10903.

### A. THE STATUTORY COMMON CARRIER OBLIGATION REMAINS

"The statutory common carrier obligation imposes a duty upon railroads to provide transportation or services on reasonable request." *Decatur Cty. Comm'rs v. Surface Transp. Bd.*, 308 F.3d 710, 715 (7th Cir. 2002) (internal citations omitted). "A railroad may not refuse to

---

1991). These facts – the federally created common carrier obligation and state regulation of passenger train discontinuance – are capable of coexistence and did, in fact, coexist.

provide services merely because to do so would be inconvenient or unprofitable." *Id.* "Purchasers of an active line of railroad acquire the common carrier obligation to ensure that service continues to be provided." *City and Cty. of Denver—Acquisition Exemption—Western Stock Show Association in the City and Cty. of Denver, Colo.*, STB Finance Docket No. 36157, slip op. at 6 (Service Date Aug. 9, 2018) (citing *S. Pac. Transp. Co.—Abandonment Exemption—Los Angeles Cty. Cal.*, 8 I.C.C.2d 495, 506 (1992)). As long as the obligation to provide commuter service existed on the day that UP acquired CNW, UP acquired that common carrier obligation along with all of the other rights and benefits that accompanied that acquisition. *Id. See also Groome & Assocs., Inc. and Lee K. Groome v. Greenville Cty. Econ. Dev. Corp.*, STB Docket No. NOR 42087, slip op. at 5 (Service Date July 27, 2005).

"This [common carrier] duty reflects the well-established principle that railroads are held to a higher standard of responsibility than most private enterprises." *GS Roofing Prods. Co. v. Surface Transp. Bd.*, 143 F.3d 387, 391 (8th Cir. 1998) (internal citations omitted). "[A] railroad may not refuse to provide services merely because to do so would be inconvenient or unprofitable. In addition, a railroad may not unilaterally abandon a line at its own election; it must instead apply for and receive permission from the proper administrative agency." *Id.* (internal citations omitted).

UP's response relies on excerpts from ICCTA's legislative history to support its view that Congress eliminated STB regulation of passenger transportation. ECF 89, UP Resp. 7, 10. However, courts interpreting ICCTA have explained that "while legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity . . . in the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive." *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998). In this case, the language of the statutes – 49 U.S.C. §§ 10102, 10501, and 10903 – confirms the

STB's continuing jurisdiction. The STB's 2010 decision in *DesertXpress* confirmed this when it explained that there was "no basis for concluding that Congress [] anticipated and carved out—much less eliminated—from the scope of the [STB]'s jurisdiction any and every other form of interstate passenger operations that might arise in the future as part of the nation's general system of rail transportation." *See* ECF 91, Metra Resp. 4-5.

### B. DISCONTINUANCE IS IRRELEVANT TO THE QUESTION UP HAS RAISED IN ITS COMPLAINT

Beyond its fixation with a repeal by implication, UP's reasoning ignores a fundamental rule of law: the question of a federal obligation is entirely distinct from the manner in which it is enforced. Obligations and the enforcement thereof have always been separate questions under the Interstate Commerce Act, and the pattern is repeated throughout federal law. *See e.g. Union Pac. R.R. Co.—Petition for Declaratory Order*, STB Finance Docket No. 35504, slip op. at 2 (Service Date Oct. 10, 2014) ("[T]he Interested Parties ask the Board to 'enforce' a decision that declined to find UP's tariff reasonable; but, by its language, the decision imposed no directive or obligation on UP regarding that tariff, so there is nothing to enforce. . . The burden of proof in a declaratory order proceeding and the enforceability of a Board order are distinct issues.")

Nevertheless, conflating obligations with enforcement is the singular flawed, logic of UP's oversimplified position on reply here. UP's prayer for relief does not request this Court to determine the scope of statutory discontinuance authority; it asks the court to rule only on the obligation: "Union Pacific asks this Court to issue a judicial declaration that Union Pacific has no common carrier obligation to operate commuter trains." ECF 1, UP Complaint, "Prayer". Simply put, if UP wanted a declaration on the question whether it could discontinue providing the commuter service on the UP Lines, it should have said so and provided the Court with its rationale in support of whichever position it advanced. That UP could not or would not do so plainly

6

demonstrates the weakness of its legal arguments and the extent to which its request to this Court now to excuse it from its duties stray from the singular question UP posed in its Complaint. The Court should not oblige.

## II. UP'S INTERPRETATION OF ICCTA IS CONTRADICTED BY CONGRESSIONAL ACTIONS AND STB DECISIONS

### A. REPEAL OF §§ 10908 AND 10909 HAD NO EFFECT ON ICC/STB AUTHORITY UNDER § 10903

In its muddling of the distinction between obligations and enforcement UP laments that "Metra does not and cannot identify any remaining statutory provision granting the STB authority to regulate Union Pacific's planned discontinuance . . .". ECF 89, UP Resp. 4-5. That is false. Metra identified all relevant statutes. *See* ECF 91, Metra Br. 9 ("ICCTA did not, however, eliminate the STB's general jurisdiction over passenger rail, or the common carrier obligation to provide service on reasonable request absent a line abandonment [discontinuance] under 49 U.S.C. § 10903(a)(1) ('A rail carrier providing transportation subject to the jurisdiction of the Board . . .who intends to—(A) abandon any part of its railroad lines; or (B) discontinue the operation of all rail transportation over any part of its railroad lines, must file an application relating thereto with the Board.'). Thus, the common carrier obligation persisted."); *Id.* at 20 ("The removal of the statute that described specific STB authority, separate from the requirements of 49 U.S.C. § 10903 to approve passenger train discontinuance did not affect the agency's authority to authorize operation of passenger service or to enforce any passenger common carrier obligation that had not been lawfully terminated prior to 1995 or otherwise transferred to Amtrak."). Plainly, Metra has advanced § 10903 as a remedy a railroad must pursue if it wishes to cease providing common carrier service.

Ignoring what Metra actually argued, UP's statement is indifferent to the logic of its own propositions supporting § 10903's applicability. UP's reliance on *Chi. Southshore & S. Bend R.R. — Petition for Declaratory Order— Common Carrier Obligation*s, ICC Finance Docket No. 31577, 1989 WL 247064, at *3 (ICC Service Date Dec. 29, 1989) ("*Chi. S. Shore*") demonstrates that 49 U.S.C. § 10903 is the appropriate remedial statute here. ECF 89, UP Br. 5. UP cites *Chi. S. Shore* for the proposition that there is not a singular common carrier obligation on a rail line, but rather that passenger and freight service are distinct. *Id.* ("Pertinent to this case, a railroad may assume a common carrier obligation to provide freight service over a line without assuming an obligation to provide passenger service, and vice versa."). Linking *Chi. S. Shore* to 49 U.S.C. §§ 10908 and 10909, UP contends that the repeal of the sections repealed any such distinct "obligation to provide passenger service" contrary to the holding of *Rocky Mountaineer*.

Yet neither § 10908 nor § 10909 addressed the distinct common carrier passenger service obligation that attaches to a rail line under the rationale of *Chi. S. Shore*—the text of the sections dealt only with specific trains. *See* 49 U.S.C. § 10908(a) (1994) (applying to the "discontinuance or change in any part of the transportation of a train or ferry . . .") *cf.* ECF 89, UP Br. 7 ("Under § 10908 a railroad could invoke the federal procedures to discontinue interstate <u>trains</u> . . .") (emphasis supplied). This narrow specification was purposeful; prior to 1958, the ICC could only address "complete discontinuance" of service under the predecessor of § 10903[2], not a particular scheduled train. *See Palmer v. Massachusetts*, 308 U.S. 79, 85 (1939) ("Even when the Transportation Act in 1920 gave the Interstate Commerce Commission power to permit abandonment of local lines when the overriding interests of interstate commerce required it, this was not deemed to confer upon the Commission jurisdiction over curtailments of service and

---

[2] Section 1(18) of the Interstate Commerce Act, as historically codified at 49 U.S.C. § 1(18) and currently codified at 49 U.S.C. § 10903.

8

partial discontinuances."); *see also New Jersey v. New York , S. & W. R.R.*, 372 U.S. 1, 5 (1963). From 1958 to 1995, the ICC could regulate individual trains -- §§ 10908 and 10909 were cumulative to the ICC's § 10903 power. Neither the expansion of § 10501 jurisdiction nor the repeal of §§ 10908 and 10909 in 1996 substantially amended the text of § 10903. If, as UP contends, *Chi. S. Shore* recognizes a distinct passenger service obligation, the final cessation of that service and removal of the obligation has always been governed by Section § 10903 and its predecessor, former § 1(18).

This is further supported by UP's acknowledgement that the STB has jurisdiction over transportation by rail carrier, "including service related to the movement of passengers," ECF 89, UP Resp., 7 (citing 49 U.S.C. §§ 10501(a)(1) and 10102(9)). Yet UP ignores that when Congress' intent was to give the STB exclusive jurisdiction over service without attendant authority to address abandonment or discontinuance of operation of such service, it knew how to do so -- as with spur or sidetrack governed by 49 U.S.C. §§ 10501(b)(2) and 10906. *See* ECF 91, Metra Resp. 12 ("[W]hen Congress desires that there be no remedy or regulation except those in Subtitle IV, Part A it has been abundantly clear, circumscribing from federal and state regulatory discretion spur track, labor, local government commuter service, and solid waste," citing 49 U.S.C. § 10906, 10501(c)(2)). If Congress intended to remove the authority of the STB to govern the UP's distinct surviving passenger service obligation on the UP Lines, it would have explicitly done so in ICCTA.

UP reiterates its argument that ICCTA's repeal of §§ 10908 and 10909 implicitly authorized railroads to "exit any common carrier passenger service without obtaining federal authorization." ECF 89, UP Resp. 7. UP supports this statement with a comparison citation to a 1985 case which states that "railroads that chose not to discontinue passenger service [pursuant to RPSA] remained subject to the obligation to provide that service imposed on common carriers by

9

the Interstate Commerce Act." *National R. Passenger Corp. v. Atchison, T. & S. F. Ry. Co.*, 470 U.S. 451, 455 n. 7 (1985). UP's reliance on this case is startling since it supports the concept that any common carrier obligation held by railroads before passage of the RPSA that were not transferred to Amtrak remained in effect. UP's argument here and its reference to this case appears to rely on the absence of law to support its assertions about its present-day obligations. But UP's citation misfires. Relying on negative propositions -- a lack of fact or law -- is hardly sufficient to justify the relief that UP seeks in its Complaint and the wide-ranging consequences such relief would impose on the Chicago commuting public.

UP argues that "adopting Metra's position would be inconsistent with the history and purpose behind the enactment of ICCTA and the trend towards deregulation which it represents" (quoting *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1091 (9th Cir. 2007)), ECF 89, UP Resp. 9). This argument misses the mark, too. *DHX, Inc.*, involved a dispute over water carrier pricing and unreasonable practices in that industry -- circumstances that are starkly different from the common carrier obligation issue that UP has raised before this Court. *DHX, Inc.*, 501 F.3d at 1091-92. *DHX, Inc,* does not have any bearing on the common carrier obligation, which was unchanged in ICCTA.

UP attempts to distinguish *Rocky Mountaineer*, in which the STB acknowledged its jurisdiction over the entry and exit of passenger routes, *Rocky Mountaineer*, STB Finance Docket No. 35851, slip op. at 3-4; ECF 89, UP Resp., 10. According to UP, in *Rocky Mountaineer*, "the STB was not actually addressing a request to exit a 'passenger route,' so we cannot say for certain how the agency would reconcile its statement with its recognition that Congress 'repealed the statutory sections regulating the passenger train discontinuance.'" *Id. citing DesertXpress*, STB Finance Docket 34914 at 10.

However, *Rocky Mountaineer* is on point here. By granting an exemption from its own regulatory requirements, the Board freed Rocky Mountaineer from the statutory requirements relating to market exit and entry -- requirements that would otherwise apply to passenger rail carriers subject to the Board's jurisdiction. Rocky Mountaineer sought the exemption from the Board's regulation because "it may change service frequencies based upon season demands and market potential and [] an exemption from the requirement of seeking Board authority in each instance would allow Rocky Mountaineer more flexibility in meeting the demands for its services." *Rocky Mountaineer*, FD 35851, slip op. at 5. The Board concurred, specifically finding that an exemption would "allow[] Rocky Mountaineer to enter and exist passenger routes without the need for regulatory approval." *Id.* By granting the exemption in *Rocky Mountaineer*, the STB recognized is own authority over exit from passenger service under § 10903. Why has UP not similarly sought an exemption from federal oversight at the STB? The answer is in the question.

UP also minimizes the import of the assertion of its predecessor, CNW, that it had a common carrier obligation to provide the commuter rail passenger service in a 1978 Commuter Grant Agreement. ECF 89, UP Resp. 11. UP suggests that whatever common carrier obligation CNW had in 1978 is irrelevant to UP's current common carrier obligation. *Id.* However, the law is clear that when UP acquired CNW in 1995, it acquired CNW's common carrier obligation. *See Groome & Assocs., Inc., supra,* slip op. at 5.

### B. ICCTA'S PREEMPTION PROVISION DOES NOT APPLY TO UP'S COMMON CARRIER OBLIGATION

As Metra explained in its Response in Opposition, ECF 91, Metra Resp. 8-9, federal preemption of local regulations is not applicable in this case. ICCTA preemption does not provide the cover that UP seeks.

First, courts have repeatedly established that:

11

> ICCTA does not preempt state or local laws if they are laws of general applicability that do not unreasonably interfere with interstate commerce. The ICCTA preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation. What matters is the degree to which the challenged regulation burdens rail transportation.

*BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760-761 (9th Cir. 2018).

Second, neither the STB nor any court has held that the railroads' common carrier obligation was preempted. To the contrary, courts have held that railroads' "obligation as common carriers is comprehensive and exceptions are not to be implied." *American Trucking Ass'n*, 387 U.S. at 407. Railroads "cannot lawfully make fulfilling their statutory obligations contingent upon whether they think it is 'worth it' to do so. Rather, a carrier must adhere to its statutory obligations even if it suffers hardship in so doing." *Pejepscot Indus. Park, Inc., d/b/a Grimmel Indus.— Petition for Declaratory Order*, 6 S.T.B. 886, 898 (2003) (citing *Decatur Cty. Commissioners*, 308 F.3d at 715). UP cannot walk away from a 150-year old service obligation that, pre-COVID, was relied upon for 97,000 daily passenger trips by applying the doctrine of preemption.

### C. IF THIS COURT FINDS THAT THE STB LACKS JURISDICTION, ILLINOIS COMMERCE COMMISSION DOES AND CONTROLS UP'S ATTEMPT TO CHANGE THE COMMUTER SERVICE IT PROVIDES ON THE UP LINES

Finally, UP disputes the role of the Illinois Commerce Commission ("Ill.C.C.") if this Court finds the STB lacks jurisdiction. ECF 89, UP Resp., 12-15. Here again, UP misinterprets the preemptive effect of ICCTA as eliminating any role for a state entity such as the Ill.C.C. *Id.* at 13. *If*, as UP asserts, the repeal of Section 10908 removed the remedy of discontinuance from the STB's arsenal, and *if,* as UP asserts, 49 U.S.C. § 10903 does not apply here, then *because* there is no counterpart to 49 U.S.C. § 10501(b)(2) and § 10906 that otherwise saves the STB's authority over passenger service discontinuance, *then* there is no federal preemption. UP's reliance on the

12

Supremacy Clause does not create preemption where Congress has removed the legislative provisions that would create it. [3] Quite the opposite.

In making this argument, UP ignores the role of the Ill.C.C. that very much remains in effect if there is no jurisdiction or authority at the federal level. ECF 91, Metra Resp. 13-14. While the regulatory structure in Illinois has been altered to accommodate federal law, *see* ECF 89, UP Resp. 12-13, including ICCTA, the Ill.C.C. has a role to play in the absence of federal regulation.

Indeed, the Ill.C.C. repealed its passenger discontinuance regulations only when it determined "[t]here is no longer any passenger service in the State of Illinois subject to the jurisdiction of commission. It is appropriate to repeal these rules." 11 Ill Reg. 942. The repeal was not due to a change in state law or jurisdiction but a change in facts -- which were true enough at the time, since commuter service provided by CNW (and others) under purchase of service agreements were not subject to the IL.C.C.'s jurisdiction. Until the present threat, no one could contemplate that CNW or its successors would refuse service to Metra. But the law continues to provide an enforcement mechanism; if UP no longer has an agreement with Metra, the Ill.C.C. would have a basis for jurisdiction over passenger discontinuances where the STB does not. Metra Br. 21-22 ("However, if a railroad's agreement with RTA lapses, then the Illinois Commerce

---

[3] UP presents no authority to demonstrate that the Supremacy Clause acts in a manner which would relieve UP of its common carrier obligation. Rather, the Supremacy Clause is implicated in the jurisdictional statement in § 10501(b), which states that STB's jurisdiction over the remedies provided in the statute are "are exclusive and preempt the remedies provided under federal or state." This statement neither relieves UP of its common carrier obligation, nor permits it to unilaterally exercise the remedy of discontinuance. If, as UP claims, the remedies under §§ 10908 and 10909 preempted the field, then § 10501(b) would not preempt a remedy enacted by the state in that regard and the area of passenger discontinuance would not be preempted. In the same vein, *Wedemeyer v. CSX Transp. Inc.*, 850 F.3d 889 (2017), relied upon by UP, UP Resp., 5, is instructive. In *Wedemeyer*, the Court noted that under § 10906, the STB had jurisdiction over the track at issue but no authority to require discontinuance as a remedy. "Transactions involving spur track do not call for the [STB's] authorization ... but the Board nonetheless retains exclusive jurisdiction under § 10501(b)(2)." *Id.* at 897 n.8 (citation omitted). Here, UP has no remedy since it asserts that the sections involving discontinuance of passenger rail are repealed and therefore, there is no preemption. Thus, UP is neither relieved of its common carrier obligation, nor permitted to unilaterally exercise the remedy of discontinuance.

13

Commission regains jurisdiction. *See Regional Transp. Auth. v. Ill. Commerce Comm'n*, 455 N.E.2d 172, 175 (1983)"). That the legal fail-safe was intended to remain in place is evident by contrast–when Illinois determined it was without jurisdiction over a particular area, it stated so simply in the same series of rule repeals. *See e.g.* 11 Ill. Reg. 298 (repealing regulations over passenger service rates) ("The Commission no longer has jurisdiction over rail carrier passenger fares."). Recent recodification of the jurisdictional statute from the Public Utilities Act to Illinois Commercial Transportation Law has done nothing to change that, as the prior and recodified texts regarding passenger service are to be interpreted identically. Metra Br. 21; 625 ILCS 5/18c-1102 ("Where the language of any provision in this Chapter is substantially similar to the language in the predecessor statute, the legislative intent expressed in this Chapter shall be the same as the legislative intent embodied in the predecessor statute as construed by the courts of this State and, where appropriate, reports of the Illinois Motor Vehicle Laws Commission.").

Congress contemplated that states should have discretion to fill the purported "regulatory void;" the ICCTA Senate Report UP cites in its own brief indicates that the drafters viewed rail passenger transportation (other than Amtrak) as "purely local or regional in nature and should be regulated (if at all) at that level." S. Rep. No. 104-176, at 29.

Thus, if UP's exit from the fulfillment of its common carrier obligation is not subject to approval by the STB, the State of Illinois would have an interest in preserving service on lines it supports. It plainly has in place the mechanisms to do so. Metra Br. 21 ("The ICTL requires a railroad to "provide adequate service to the public at reasonable rates and without discrimination. 625 Ill. Comp. Stat. Ann. 5/18c-7202. . . . 625 ILCS 18c-7101 ("The jurisdiction of the Commission under this Sub-chapter shall be exclusive and shall extend to <u>all</u> intrastate and interstate rail carrier operations . . . , <u>except to the extent that its jurisdiction is preempted</u> by valid

provisions of the Staggers Rail Act of 1980 or other valid federal statute, regulation, or order.") (emphasis supplied). Accordingly, UP still has an obligation under state law to provide service unless and until it obtains state authorization to discontinue service.

UP cannot evade regulation at the state and the federal level. UP has a common carrier obligation and must continue to provide transportation consistent with that obligation unless and until it receives the proper regulatory authorization to cease service.

## CONCLUSION

UP began this litigation by asking the Court to rule on whether it has a common carrier obligation to operate trains. However, UP has since demonstrated in its correspondence with Metra that its true intent is to halt service and potentially strand tens of thousands of Chicago area commuters. The answer to the question UP poses is that it does have a common carrier obligation that it acquired from its predecessor, the CNW, and there is simply no statutory or case law basis for its assertion that this obligation has disappeared.

WHEREFORE, Metra respectfully requests this Court to grant its Motion for Summary Judgment and find that the Union Pacific has a common carrier obligation to operate commuter service on the UP Lines and for other relief as is appropriate.

Respectfully Submitted,

*/s/ Charles A. Spitulnik*

| | |
|---|---|
| Robert T. Shannon | Charles A. Spitulnik |
| Adam L. Saper | KAPLAN KIRSCH & ROCKWELL LLP |
| HINSHAW & CULBERTSON LLP | 1634 I ("Eye") Street NW, Suite 300 |
| 151 N. Franklin Street, Suite 2500 | Washington, DC 20006 |
| Chicago, Illinois 60606 | (202) 955-5600 |
| (312) 704-3000 | |