## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNION PACIFIC )
RAILROAD COMPANY, )
                       )
    Plaintiff, )
                      )       No. 19 C 7957
    v. )
                      )       Judge Jorge L. Alonso
THE REGIONAL TRANSPORTATION )
AUTHORITY and its COMMUTER RAIL )
DIVISION, d/b/a/ METRA, )
                       )
    Defendant. )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Union Pacific Railroad Company ("Union Pacific"), after failing to reach an agreement with the Regional Transportation Authority and its Commuter Rail Division ("Metra"), filed suit seeking a declaration that it has no common carrier obligation to provide commuter services on three particular lines.[1] The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court grants plaintiff's motion for summary judgment and denies defendant's motion for summary judgment.

## I.    BACKGROUND

The word commute now connotes one's transportation to or from work by any mode, be it foot, bus, bike, car or rail. Originally, all commuters traveled by rail, and they were called that because their fares were reduced (commuted) to reflect the fact that they were traveling not the whole train route but a short distance, usually into a large city. Commuter rail service has

---

[1] The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000.00. Plaintiff Union Pacific is a Delaware Corporation with its principal place of business in Nebraska. Metra is an Illinois municipal corporation with its principal place of business in Illinois.

existed since the 1800's, and the issue in this case is whether Union Pacific has a common carrier obligation to provide commuter rail service on certain of its lines.

The following facts are undisputed unless otherwise noted.[2]

Metra is a municipal corporation that provides commuter service to and from Chicago over eleven rail routes. Of those eleven routes, Metra owns and operates four: Metra Electric, Milwaukee District North, Milwaukee District West and Rock Island. In addition, Metra operates three lines (Heritage Corridor, North Central Service and SouthWest Service) on tracks that are owned (or partly owned) by freight railroads. The final four lines are operated by freight railroads via purchase-of-service agreements. Three of those lines—Union Pacific North (which runs to Kenosha, Wisconsin), Union Pacific Northwest (which runs to McHenry, Illinois) and Union Pacific West (which runs to Elburn, Illinois)—are operated by Union Pacific.

Union Pacific is an interstate freight railroad. It provides common carrier freight service in 23 states. The only portion of its 32,000 miles of tracks where it operates commuter rail services are the three lines over which it operates commuter rail services for Metra. Union Pacific began providing those commuter services on or about October 1, 1995, when it merged with the Chicago & North Western railway company.

---

[2] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Furthermore, the Court does not consider facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.

The Chicago & North Western railway company owned the tracks at issue in this case before Union Pacific and provided commuter rail service on those lines, beginning in 1859. Once the Regional Transportation Authority was created in 1974[3], Chicago & North Western railway entered a series of purchase-of-service agreements with Metra, which agreements were signed in 1975, 1980 and 1984. In 1978, Chicago & North Western railway entered an agreement with Metra that said, among other things:

ARTICLE VI

Continued Use in Commuter Rail Service
and Use of the Project Facilities

6.01  Applicability of This Article.  This Article applies only to the Kedzie Interlocker, the ties, rail and ballast used to rehabilitate any track and any other property or materials permanently installed on Railroad's right-of-way as part of a Project.

6.02  Continuance of Service.  During the period of use of the Project Facilities . . . Railroad shall provide Commuter Rail Service over or upon the Project Facilities in accordance with the terms of the Service Agreement. In the event no Service Agreement is in effect, Railroad shall provide Commuter Rail Service over or upon the Project Facilities *in accordance with its common carrier obligations*. Reduction or termination of such service may be made only upon compliance with all applicable statutory and regulatory provisions.

[Docket 85-3 at 27-28 (emphasis added)]. Chicago & North Western railway never sought permission to discontinue commuter rail passenger service on the lines at issue in this case.

Since Union Pacific merged with Chicago & North Western, it has provided commuter rail services under purchase-of-service agreements with Metra. The January 1, 2010 purchase-of-service agreement between Union Pacific (which is referred to as "Railroad" in the

---

[3] The Regional Transportation Authority was created by referendum. *See* 70 ILCS 3615/1.05 ("A special referendum election shall be held at which there shall be submitted to the electors in the metropolitan region the proposition to approve creation of the Authority, which proposition shall be in substantially the following form: Shall a Regional Transportation Authority be created for Cook, DuPage, Kane, Lake, McHenry and Will Counties, Illinois?")

agreement) and the Commuter Rail Division of Metra (which is referred to as CRD in the agreement) states, among other things:

ARTICLE II

Services to be Provided
By Railroad

2.01 Basic Scope of Services. Railroad hereby agrees that throughout the Agreement Term, Railroad, acting as an independent contractor for the benefit of the CRD, will provide Public Transportation Services by rail.

[Docket 1 at 17].

Under that 2010 purchase-of-service agreement, Union Pacific employees operate the trains, sell tickets and collect fares, which are set by Metra. The train cars themselves are owned by Metra, while Union Pacific owns the track, bridges and signals, which are also used for Union Pacific's freight operations. Under the purchase-of-service agreement, Metra paid Union Pacific operating payments of $61,000,000.00 in 2019. That same year, Metra provided Union Pacific in-kind benefits—such as fuel, parts, uniforms and rent—worth $37,000,000.00.

The 2010 purchase-of-service agreement had an effective date of January 1, 2010 through the earlier of: (1) the date either party terminated the agreement; or (2) December 31, 2016. Since then, the parties have negotiated short-term extensions of the agreement. The parties have not, however, been able to agree on a new purchase-of-service agreement, despite engaging in negotiations in 2019 and 2020. One reason they have been unable to agree is that, during those negotiations, the parties disagreed (and continue to disagree) as to whether Union Pacific has a common-carrier obligation to provide commuter services on the lines at issue in this case. In June 2020, Union Pacific notified Metra that, by August 2020, it would discontinue providing services on the Union Pacific North, Union Pacific West and Union Pacific Northwest Lines. Metra told Union Pacific that it cannot stop operating commuter trains, because it has a common-

carrier obligation to provide the services even in the absence of a purchase-of-service agreement. Union Pacific has: (1) informed Metra that it believes it has no such obligation; and (2) urged Metra either to take over operation of the commuter trains on those lines or to hire another operator to do so.

At an impasse, Union Pacific filed this suit seeking a declaration that it has no common carrier obligations to provide commuter services on the three lines. Both parties move for summary judgment.

## II.     STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). When "the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of finding in favor of the non-movant on the claim. If the movant has failed to make

this initial showing, the court is obligated to deny the motion." *Hotel 71 Mezz Lender LLC v. The National Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citations omitted).

## III.    DISCUSSION

### A.    Union Pacific's request for declaratory judgment

Pursuant to the Declaratory Judgment Act, "[i]n a case of *actual controversy* within [the court's] jurisdiction," this Court "may declare the rights and other legal relations of any interested party seeking such declaration[.]"  28 U.S.C. § 2201(a) (emphasis added).  Here, the parties present an actual controversy, because Union Pacific has notified Metra that it plans to discontinue the services (operating trains, selling tickets and collecting fares) it provides Metra in connection with Metra's commuter rail service, and Metra has insisted that Union Pacific has a common carrier obligation to continue providing those services even in the absence of a purchase-of-service agreement.  The impasse constitutes an actual controversy.  There are no material disputes of fact, and the case presents solely a legal issue upon which the parties disagree.

Regulation of common carriers has a long history.  About 200 B.C., the Romans codified liability laws for common carriers on their vast system of roads.  *See* Paul Stephen Dempsey, "Transportation:  A Legal History," 30 *Transp. L.J.* 235, 241-42 (Spring-Summer 2003). English and American common law long required common carriers to serve without discrimination.  *Id.* at 242.  With the advent of railroads came common carrier obligations for them, and this is how one federal court described the reason why railroads had common carrier obligations:

> It is true that common carriers, like railroad companies, which enjoy peculiar rights and powers at the hand of the state, are not permitted to discontinue at will the rendition of the transportation services for the performance of which they have been endowed with special privileges and powers.  A railroad company is clothed

6

by the state with special rights, franchises, and privileges, including certain
attributes of sovereignty itself, as, for example, the power of eminent domain.

*Lucking v. Detroit & C. Navigation Co.*, 273 F. 577, 582 (E.D. Mich. 1921).

Federal regulation of railroads was prompted by an 1886 decision of the Supreme Court,

which was concerned about a patchwork of regulation across the states.  That year, the Supreme

Court considered an Illinois statute that regulated railroad prices.  The Supreme Court held that

the Illinois law was unconstitutional in the face of Congress' power to regulate interstate

commerce, explaining:

> if each one of the states through whose territories these goods are transported can
> fix its own rules for prices, for modes of transit, for times and modes of delivery,
> and all the other incidents of transportation to which the word 'regulation' can be
> applied, it is readily seen that the embarrassments upon interstate transportation,
> as an element of interstate commerce, might be too oppressive to be submitted to.
> . . .  It cannot be too strongly insisted upon that the right of continuous
> transportation, from one end of the country to the other, is essential, in modern
> times, to that freedom of commerce, from the restraints which the states might
> choose to impose upon it, that the commerce clause was intended to secure.  This
> clause, giving to congress the power to regulate commerce among the states, and
> with foreign nations, as this court has said before, was among the most important
> of the subjects which prompted the formation of the constitution.  And it would be
> a very feeble and almost useless provision . . . if, at every stage of the
> transportation of goods and chattels through the country, the state within whose
> limits a part of this transportation must be done could impose regulations
> concerning the price, compensation, or taxation, or any other restrictive regulation
> interfering with and seriously embarrassing this commerce.

*Wabash, St. L. & P. Ry. Co. v. Illinois*, 118 U.S. 557, 572-73 (1886) (internal citations omitted).

The next year, in 1887, Congress passed "an act to regulate commerce," which act later

became known as the Interstate Commerce Act.  24 Stat. 379.  It applied "to any common carrier

or carriers engaged in the transportation of passengers or property wholly by railroad, or partly

by railroad and partly by water."  24 Stat. 379.  Section three of the Act said, "[e]very common

carrier . . . shall, according to their respective powers, afford all reasonable, proper, and equal

facilities for interchange of traffic between their respective lines, and for the receiving,

forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines[.]" 24 Stat. 379 § 3.

With the rise of the automobile, the interstate highway system and airplanes, transportation of passengers by rail waned. "Whereas in 1929 about 20,000 intercity trains operated in the country, by 1946, there were only about 11,000 such passenger trains; by 1971, fewer than 500 passenger trains still operated." *National RR Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co.*, 470 U.S. 451, 454 (1985). The railroads, though, "as common carriers" were still "bound to continue providing service until the Interstate Commerce Commission (ICC) or state regulatory authorities relieved them of this responsibility." *Atchison*, 470 U.S. at 454.

Prior to 1958, if a railroad wanted to discontinue money-losing passenger service but keep its freight service, it needed the permission of the various states through which the railroad tracks were situated. To make it easier, Congress passed the Transportation Act of 1958. The Supreme Court has described the reasons:

> The legislative history of that Act reveals Congress' concern about the financial plight of railroads, attributable in part to the losses sustained in operating passenger trains. To discontinue these trains before the enactment of s 13a, the railroads were required in all cases to seek authority from each of the States served. Without concurrence of all the States affected, the railroad might be compelled to continue operations despite serious losses. The Interstate Commerce Commission was able to give only partial relief. *It could authorize the total abandonment of a line* of railroad under s 1(18) of the Act, even if the line was wholly within the boundaries of one State. However the Commission could not permit *discontinuance of service over a line of railroad* whether the line crossed state boundaries or not.

8

*New Jersey v. New York, Susquehanna and Western RR Co.*, 372 U.S. 1, 5 (1963) (emphasis added) (internal citations omitted).[4]  Section 13a of the Interstate Commerce Act, which was part of that 1958 Transportation Act, allowed a means by which a carrier could obtain permission from the Interstate Commerce Commission for a "discontinuance or change, in whole *or in part*, of the operation or service of any *train*" without having to abandon the entire line.  Pub. Law 85-625 § 13a (emphasis added); *see also Southern Ry. Co. v. North Carolina*, 376 U.S. 93, 101 (1964) (Prior to § 13a, "the Commission totally lacked power to discontinue particular trains or services while leaving the remaining services in operation.  It was precisely this gap which s 13a(2) was intended to fill.").

Passenger rail travel continued to decline.  In response to the problem of rail carriers' being saddled with common carrier obligations to passengers even after consumer demand for rail transportation had plummeted, Congress, in 1970, passed the Rail Passenger Service Act of 1970, 84 Stat. 1327, P.L 91-518.  That Act created the National Railroad Passenger Corporation (i.e., Amtrak) and outlined a process by which a railroad "would be relieved 'of all [its] responsibilities as a common carrier of passengers by rail in *intercity rail passenger service* under [federal or state law]' 45 U.S.C. § 561(a)(1) (1970 ed.)" in exchange for the railroad's paying Amtrak half of its passenger losses in 1969 and granting Amtrak access to its tracks, among other things.  *Atchison*, 470 U.S. at 455 (emphasis added).  The 1970 Act, though, defined intercity rail passenger service to exclude commuter rail service.  Public Law 91-518 § 102(5) ("Intercity rail passenger service' means all rail passenger service other than (A)

---

[4] The difference between discontinuance and abandonment is that an abandonment is permanent, such that an abandoned line is "no longer part of the national transportation system." *Preseault v. ICC*, 494 U.S. 1, 5 n. 3 (1990).  A discontinuance "allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." *Preseault*, 494 U.S. at 5 n. 3.

commuter and other short-haul service in metropolitan and suburban areas, usually characterized by reduced fare, multiple-ride and commutation tickets, and by morning and evening peak period operations"). Thus, the 1970 Act did not provide a means for railroads to offload their common-carrier obligation to carry commuter passengers.

Congress continued to deregulate railroads. In 1980, Congress passed the Staggers Act, because it was determined to "loosen the grip of regulation over abandonments and other practices." *People of the State of Ill. v. Interstate Commerce Com'n*, 722 F.2d 1341, 1347 (7th Cir. 1983).

Prior to 1995, two provisions governed discontinuance of train service. Section 10908 governed "discontinuance or change in any part of the transportation of a train" that operated interstate, while Section 10909 governed "discontinuance or change in any part of the transportation of a train" within one state. 49 U.S.C. §§ 10908, 10909 (1994 ed.). Even with respect to train service solely within one state, the ICC was authorized to "grant permission to discontinue or change any part of the transportation" if it found such discontinuance was necessary for the public convenience and if continuing the service would be an unreasonable burden to the carrier. 49 U.S.C. § 10909(c) (1994 ed.).

In 1995, Congress abolished the Interstate Commerce Commission by passing the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, et seq. In the House Report, the House described the history of railroad regulation and the reasons behind the bill as follows:

> Since 1980, with the enactment of the Staggers Rail Act, the railroad industry has operated in an essentially deregulated environment. It took the near collapse of the entire industry and possible nationalization of all the nation's railroads to bring this deregulation about.

10

The rail economic regulatory framework that existed prior to 1980 was developed, for the most part, during the late 19th century and the early 20th century *when railroads had a virtual monopoly* in many areas. At the time of the ICC's creation in 1887, the market conditions of the railroad industry were markedly different than they are today. Because railroads possess certain characteristics of natural monopolies, *in the absence of competition from other modes of transportation*, *railroads were able to wield enormous power* over the shippers and communities they served. For a railroad to withdraw service from an area, for example, threatened the livelihood of entire communities.

The *transportation sector has changed dramatically* since the time of the ICC's creation. With the emergence of the trucking industry, as well as the pipeline and barge industries, *railroads have increasingly faced competition* from other modes of transportation. Unfortunately, Federal regulations did not always keep pace with the changing market. The combination of onerous Federal regulations and stiff competition from the motor carrier industry proved lethal for the railroads; by the 1970s, the railroad industry was on the brink of financial collapse.

House Report 104-311 at 90 (emphasis added).

The House Report summarized the bill as "eliminat[ing] obsolete rail provisions and transfer[ring] those activities that need to be continued to the Department of Transportation." House Report 104-311 at 82. The House Report also states:

Provisions and activities that are repealed or eliminated in H.R. 2539 include:

\* \* \*

Regulation of entry, exit, and fares of passenger rail service.

House Report 104-311 at 82. The Conference Report, too, describes the Act as "reflect[ing] curtailment of regulatory jurisdiction in areas such as passenger transportation" and notes "regulation of passenger transportation is generally eliminated[.]" Conf. Rep. 104-422 at 167. Section 10101 of the ICCTA states, "it is the policy of the United States Government-- . . . (7) to reduce regulatory barriers to entry into and exit from the industry[.]" 49 U.S.C. § 10101(7).

After the ICCTA passed, the Surface Transportation Board (which was created by the ICCTA) retained jurisdiction over certain, but not all, abandonments and discontinuances. Under the ICCTA, a "rail carrier subject to the jurisdiction of the Board . . . who intends to—(A)

abandon any part of its railroad lines; or (B) discontinue the operation of *all* rail transportation over any part of its railroad lines, must file an application relating thereto with the Board." 49 U.S.C. § 10903(a)(1) (emphasis added). Such "abandonment or discontinuance may be carried out only as authorized under this chapter." 49 U.S.C. § 10903(a)(1).

The ICCTA also set out the jurisdiction of the Surface Transportation Board. Specifically, it gave the Surface Transportation Board jurisdiction over "transportation by rail carrier" either "only by railroad" or "by railroad and water" so long as the transportation is "between a place in—

> (A) a State and a place in the same state or another State as part of the interstate rail network;
> (B) a State and a place in a territory or possession of the United States;
> (C) a territory or possession of the United States and a place in another such territory or possession;
> (D) a territory or possession of the United States and another place in the same territory or possession;
> (E) the United States and another place in the United States through a foreign country; or
> (F) the United States and a place in a foreign country.

49 U.S.C. § 10501(a). In addition, the ICCTA includes a preemption provision that makes the Surface Transportation Board's jurisdiction exclusive. Specifically, it states:

> The jurisdiction of the Board over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

The parties disagree as to whether, at this point, Union Pacific has a common carrier obligation to provide the commuter services on the Union Pacific North, Union Pacific Northwest and Union Pacific West lines. Union Pacific contends that any such obligation was dissolved with the passage of the ICCTA. Metra's position is that Union Pacific remains on the hook, because Union Pacific neither obtained permission from the Interstate Commerce Commission (before the ICCTA passed) to stop providing these services nor has received permission from the Surface Transportation Board (or from the state of Illinois) in the meantime. The law on this issue is not as clear as either party makes it out to be, but the parties agree on at least one thing.

The parties agree that the transportation at issue in this case is within the jurisdiction of the Surface Transportation Board. Union Pacific says so explicitly. [Docket 78 at 17]. Metra agrees *implicitly* by relying on 49 U.S.C. § 11101 as a source of defendant's common carrier obligation [Docket 84 at 6] and by arguing that Union Pacific must use 49 U.S.C. § 10903 in order to abandon or discontinue the commuter services [Docket 84 at 15; docket 95 at 8 ("Plainly, Metra has advanced § 10903 as a remedy a railroad must pursue if it wishes to cease providing common carrier service.")]. These two provisions apply only to transportation within the jurisdiction of the Board. *See* 49 U.S.C. § 11101(a) ("A rail carrier providing transportation or service *subject to the jurisdiction of the Board* under this part shall provide the transportation or service on reasonable request.") (emphasis added); 49 U.S.C. § 10903(a)(1) ("A rail carrier providing transportation *subject to the jurisdiction of the Board* . . . who intends to [abandon or

13

discontinue] must file an application . . . with the Board."). Metra also agrees *explicitly* that the matter is within the Board's jurisdiction. [Docket 95 at 6-7 ("the language of the statutes—49 U.S.C. §§ 10102, 10501, and 10903—confirms the STB's continuing jurisdiction.")].

It makes sense that both parties agree this matter is within the Board's jurisdiction. The undisputed facts are that the commuter service provided on the Union Pacific North, Union Pacific Northwest and Union Pacific West lines constitutes transportation "between a place in— (A) a State and a place in the same or another State as part of the interstate rail network," which is among the types of "transportation" over which "the Board has jurisdiction[.]" 49 U.S.C. § 10501(a)(2)(A). The commuter service runs from a place in Illinois (Chicago) to a place in Illinois (McHenry) or a place in another state (Wisconsin) over tracks that are part of Union Pacific's interstate rail network.[5]

Metra argues that, after the ICCTA passed in 1995, Union Pacific could stop providing the commuter services it provides on the three lines at issue in this case only by seeking the Surface Transportation Board's permission via 49 U.S.C. § 10903 (which permission Union Pacific has neither sought nor received). The Court does not agree. Under that section, Board approval is required for only two things: (1) abandonment; or (2) discontinuance of all transportation on a line. Specifically, the section states:

---

[5] Neither party argues that this case falls outside the scope of the STB's jurisdiction under the exception for public transportation. Under 49 U.S.C. § 10501(c)(2), the Surface Transportation "Board does not have jurisdiction . . . over—(A) public transportation provided by a local government authority[.]" 49 U.S.C. § 10501(c)(2). This makes sense, because the tracks at issue here are not used exclusively for commuter service. *See New Jersey Assoc. of RR Passengers*, S.T.B. Docket No. F.D. 35745, 2014 WL 3697533 at *5 (STB served July 25, 2014) ("Here, the rail facilities involved are used exclusively for commuter rail operations . . . and are exempt from the Board's jurisdiction."). Instead, Union Pacific uses the tracks for its freight operations. The Court notes, too, that if anyone in this case is holding itself out as offering common carrier commuter service, it is Metra, whose name is on the train cars, the schedules and the tickets.

> A rail carrier providing transportation subject to the jurisdiction of the Board under this part may—
>
> (1) abandon any part of its railroad lines; or
> (2) discontinue the operation of *all* rail transportation over any part of its railroad lines;
>
> *only* if the Board finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance.

49 U.S.C. § 10903(d) (emphasis added). (The difference between discontinuance and abandonment is that an abandonment is permanent, such that an abandoned line is "no longer part of the national transportation system." *Preseault*, 494 U.S. at 5 n. 3. A discontinuance "allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." *Preseault*, 494 U.S. at 5 n. 3.)

What Union Pacific wants to do in this case is neither (1) nor (2). Union Pacific does not seek to abandon the line permanently. It plans to continue offering freight service and merely wishes to stop providing the services it provides in connection with Metra's commuter passenger service. Nor does Union Pacific plan to "discontinue the operation of *all* rail transportation" on the relevant lines. Instead, it plans to continue freight service. All Union Pacific plans to stop providing are the services (operating Metra's trains, selling Metra's tickets and collecting Metra's fares) it provides Metra in connection with Metra's commuter service. Nothing in § 10903(d) restricts Union Pacific's ability to discontinue such services on the lines at issue in this case.

Prior to 1995, Union Pacific would have been required to seek the permission of the Interstate Commerce Commission in order to stop such commuter services. The prior sections, §10909 and §10908, required permission when a rail carrier planned "discontinuance or change *in any part* of the transportation of a *train* . . ." 49 U.S.C. § 10908 (1994 ed.) (emphasis added);

15

49 U.S.C. § 10909 (1994 ed.) (emphasis added). That language was broad enough to encompass discontinuance of the sort of commuter train services Union Pacific wants to stop providing now. Those sections do not apply, however, because they were repealed in 1995. Nothing in the current abandonment provision—§ 10903(d)—requires Union Pacific to seek permission of the Surface Transportation Board before discontinuing commuter service on the lines at issue in this case.

That leaves two possibilities: (1) after 1995, Union Pacific no longer needs any permission to discontinue commuter service on the relevant lines (which is Union Pacific's position); or (2) Union Pacific now needs permission from Illinois (which is Metra's position). The Court concludes that Union Pacific has the better argument.

Although the ICCTA does not explicitly state that Union Pacific does not need permission to stop providing the commuter services on the relevant lines, Union Pacific's position is consistent with the plain language of the statute. First, as explained above, the current statute does not require Union Pacific to obtain such permission, and the statutory provisions that previously required such permission have been repealed. Second, the ICCTA explicitly states that its purpose is to reduce regulatory barriers to exit. 49 U.S.C. § 10101 ("it is the policy of the United States Government-- . . . (7) to reduce regulatory barriers to entry into and exit from the industry[.]"). In light of § 10101(7), it makes sense to interpret the language of § 10903 and the repeal of §§ 10908 and 10909 as eliminating the requirement that a rail carrier obtain permission to cease providing commuter services on the lines at issue here.

That interpretation is also consistent with the legislative history. The House Report, in describing the history of railroad regulation, explained that regulation made sense in the early days of the railroads, when railroads had a monopoly and when loss of service could have

16

devastated entire communities. *See* House Report 104-311 at 90. The House Report went on to say that such regulation no longer makes sense in an era when railroads face competition from other modes of transportation. *See* House Report 104-311 at 90. The House Report specifically stated that "[r]egulation of entry, exit, and fares of passenger rail service" was eliminated (House Report 104-311 at 82), as did the Conference Report (Conf. Rep. 104-422 at 167 ("regulation of passenger transportation is generally eliminated")).

Finally, that interpretation is consistent with a line of decisions from the Surface Transportation Board in which the Surface Transportation Board treats the common carrier obligation as being limited to freight services. *See, e.g., New Jersey Transit Corp—Acquisition Exemption—Norfolk Southern Ry. Co.*, STB Docket 35638, 2013 WL 1247853 (STB served March 27, 2013). There, the STB, in explaining why its permission was not needed for a railroad to sell track to a local commuter service so long as the railroad retained its common carrier obligation (i.e., freight obligation), stated:

> The question at issue here is whether our regulatory authority is required for NJ Transit to acquire the physical assets of the Line where NSR retains a permanent, exclusive, and irrevocable freight easement to conduct freight rail operations. The acquisition of an active rail line, and the common carrier obligation that goes with it, ordinarily requires Board approval . . . But when the carrier selling a rail line retains an exclusive, permanent easement to permit it to continue to provide common carrier freight service and has sufficient control over the line to carry out its common carrier obligations, the Board (and its predecessor agency, the Interstate Commerce Commission (ICC)) typically has found that Board (or ICC) authorization is not required[.]
>
>       \*   \*   \*
>
> The Exchange Agreement reserves for NSR '[a] perpetual, irrevocable, and exclusive easement for Freight Service (including trackage rights) which does not unreasonably interfere with commuter operations but provides NS access and operating rights sufficient to fulfill NS's common carrier obligation . . .' The transaction will not cause NSR to transfer its common carrier obligation or permit NJ Transit to hold itself out as providing freight service.

17

*Id*. at *2-4 (internal citations omitted); *see also Sacramento Regional Transit Dist.*, STB Docket 33796, 2000 WL 893421 at *1 (STB Service Date July 5, 2000) ("UP specifically retained its common carrier obligation to provide service to shippers[.] . . . RT did not acquire the right or obligation to conduct rail freight service[.] . . . The three agreements . . . preserve for UP the property and contract rights it requires to provide rail common carrier service. The agreements show that RT will not conduct freight operations, or hold itself out to the public as being willing or able to do so[.]"). These decisions would not make sense if STB believed the freight rail carriers also had a common carrier obligation to provide commuter service.

For these reasons, the Court agrees with Union Pacific that, under the ICCTA, Union Pacific does not need the Surface Transportation Board's permission to stop providing the commuter services on the lines at issue in this case.

The alternative Metra advocates—that Union Pacific has a state-law common carrier duty and must seek the state's permission to toss off that yoke—is untenable in the face of ICCTA's preemption provision. Metra argues that Union Pacific has a common carrier duty under 625 ILCS 5/18c-7202, which states, "Each rail carrier shall provide adequate service to the public at reasonable rates and without discrimination." Metra says Union Pacific requires the permission of the Illinois Commerce Commission to stop such service, but Metra does not cite any Illinois statute that says so explicitly. In any case, it appears to this Court that any such requirement would be categorically preempted by 49 U.S.C. § 10501(b).

That section says that the "jurisdiction of the Board" over "transportation by rail carriers and the remedies provided in this part with respect to . . . routes, services, and facilities; and . . . construction, acquisition, operation, abandonment or discontinuance . . . is exclusive." 49 U.S.C. § 10501(b). The section further provides that the "remedies" are "exclusive and preempt the

18

remedies provided under Federal or State law." 49 U.S.C. § 10501(b). The Seventh Circuit has noted that this provision means that attempts by states to regulate railroad abandonments are categorically preempted. *See Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894-95 (7th Cir. 2017). There, the Seventh Circuit explained:

> 'Categorical preemption occurs when a state . . . action is preempted on its face despite its context or rationale,' such as when state preclearance could be used to deny a railroad the ability to conduct some part of its operations, or when a state regulates matters directly regulated by the STB (*e.g.*, the construction, operation, and abandonment of rail lines).

*Wedemeyer*, 850 F.3d at 894-95 (quoting *Union Pacific RR Co. v. Chicago Transit Authority*, 647 F.3d 675, 679 (7th Cir. 2011)). The Seventh Circuit has also recognized that "Congress' intent in the Act to preempt state and local regulation of railroad transportation" is "broad and sweeping." *Union Pacific*, 647 F.3d at 678. Any state regulation requiring permission to discontinue commuter services on the lines at issue in this case is categorically preempted even though the federal regime does not require a rail carrier to seek such permission from the Surface Transportation Board. *See CSX Transp., Inc. v. Georgia Public Service Com'n*, 944 F.Supp. 1573, 1581 (N.D. Ga. 1996) ("Defendants, however, read the ICC Termination Act's preemption clause to preempt state remedies only when federal remedies are provided under the Act. Defendants thus reason that the Act does not preempt state regulation of railroad agency closings because the Act provides no federal remedy for railroad agency closings. Defendants' argument reflects a misunderstanding not only of the plain language of section 10501(b)(2), but also of the ICC Termination Act generally. The most natural reading of section 10501(b)(2) is that the federal remedies provided by the ICC Termination Act are the only remedies available as to the regulation of rail transportation, and that the federal remedies are exclusive of state remedies except where the ICC Act has expressly provided otherwise.") (internal citations omitted).

Accordingly, the Court agrees that Union Pacific does not have a common carrier obligation to provide the commuter services at issue in this case on the lines at issue in this case. That conclusion does not mean that commuter rail service will cease on those lines. Metra, which already provides the train cars and sets the fares for such service, remains free to reach an agreement under which either Metra or a third party provides the services (operating Metra's train cars, selling Metra's tickets and collecting Metra's fares) that Union Pacific is no longer willing to provide.

### B.     Metra's proposed counterclaim

After the close of discovery and after the Court had set a briefing schedule on the parties' motions for summary judgment, Metra filed a motion for leave to file a counterclaim against Union Pacific. Metra filed the motion before the parties had filed their opening summary judgment papers but noticed it up for a hearing date after the first summary judgment papers were due.

Metra's proposed counterclaim is, in essence, a claim that Union Pacific has a contractual obligation, under the 1978 Agreement signed by Chicago and North Western and other agreements, to continue providing the services at issue in this case. In its motion, Metra says, "the proposed counterclaim calls for a contractual interpretation" and that the counterclaim would be moot to the extent this Court concludes that Union Pacific has a common carrier obligation to provide the services. [Docket 67 at ¶¶ 19-20]. In its proposed counterclaim, Metra alleges that the 1978 Agreement said, "In the event no Service Agreement is in effect, Railroad shall provide Commuter Rail Service over or upon the Project Facilities *in accordance with its common carrier obligations*." [Docket 67-1 ¶ 26 (emphasis added)]. Metra further alleges that agreements Chicago and North Western signed in 1981 and 1983 required the railroad to

provides services, during times when no service agreement was in effect, in accordance with all "requirements of common and statutory law[.]"  [Docket 67-1 ¶¶ 32, 39].  Finally, Metra's proposed counterclaim alleges that a 2017 agreement "requires best efforts to continue to provide commuter services for which the improvements were constructed, and provides that there could be no termination of such services 'without compliance with all applicable statutory and regulatory provisions.'"  [Docket 67-1 ¶ 44 (citing Ex. E to 2017 Grant Agreement, Item 8, Exhibit D)].  The cited provision, which Metra attached to its proposed counterclaim, states:

> ITEM 8 – CONTINUANCE OF SERVICE
>
> The *Grantee* agrees to use its best efforts to continue to provide, either directly or by contract or service agreement, as the case may be, the service(s) for which these Project Facilities are being acquired or constructed . . .  No reduction or termination of such service shall be made without compliance with all applicable statutory and regulatory provisions.

[Docket 67-5 at 60 (emphasis added)].  The "Grantee" in the above provision is Metra, not Union Pacific.  [Docket 67-5 at 56 ("This Contract No. 4588 (hereinafter referred to as "Agreement") is made by and between the Illinois Department of Transportation, Division of Public and Intermodal Transportation, (hereinafter referred to as the "State" or "Department" and the Regional Transportation Authority (hereinafter referred to as the "Grantee")].

Union Pacific objects to Metra's proposed counterclaim, pointing out that Metra's request came after the close of discovery and after the parties had started briefing the cross motions for summary judgment.  The Court agrees that Metra's request came late, particularly considering that Metra was aware of all of the agreements it cites in its proposed counterclaim before it filed its answer.

The Court might be willing to overlook the lateness of the proposed counterclaim but for one problem:  amendment would be futile.  As Union Pacific points out, the 1978, 1981 and

1983 agreements *assumes* the existence of a common carrier obligation to provide the services, and this Court has already concluded that is not the case. The portion of the 2017 agreement that Metra attempts to enforce against Union Pacific is a provision in which *Metra*, not Union Pacific, agreed to use its best efforts to continue service. Amendment would be futile, in addition to being late.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants Union Pacific's motion [76] for summary judgment and denies Metra's motion [83] for summary judgment. The Court denies Metra's motion [67] for leave to file counterclaim. Union Pacific is entitled to a judgment declaring Union Pacific Railroad Company has no common carrier obligation to provide services (operating trains, selling tickets and collecting fares) to Metra for its commuter rail services on the Union Pacific North, Union Pacific West and Union Pacific Northwest lines. Civil case terminated.

**SO ORDERED.**                                      **ENTERED: September 23, 2021**

                                                      _____
                                                      **HON. JORGE ALONSO**
                                                      **United States District Judge**