**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:19-cv-07957 |
| | ) | Judge Jorge L. Alonso |
| COMMUTER RAIL DIVISION OF THE | ) | Magistrate Judge Gabriel Fuentes |
| REGIONAL TRANSPORTATION | ) | |
| AUTHORITY, d/b/a METRA, | ) | |
| | ) | |
| Defendant. | ) | |

**METRA'S COMBINED RULE 59(e) MOTION TO**
**ALTER OR AMEND JUDGMENT AND RULE 15 MOTION FOR LEAVE TO AMEND**

The Commuter Rail Division of the Regional Transportation Authority ("Metra"), by its attorneys, Robert T. Shannon and Adam L. Saper, moves to alter or amend the September 23 Memorandum Order and Opinion ("Order") pursuant to Rule 59(e), and for leave to amend to file its counterclaim pursuant to Rule 15(a)(2) and/or 15(b)(2). In support of its motion, Metra states as follows:

## I.   INTRODUCTION

The Court committed manifest errors of fact and law when it denied Metra leave to file a proposed counterclaim based on the 2017 Grant Agreement. The Court reasoned that the proposed counterclaim was futile because Union Pacific Railroad Company ("UP") was not bound by Item 8 of the State Capital Grant Agreement, which is part of Exhibit E to the 2017 Grant Agreement. The Court found that the State Capital Grant Agreement is a contract solely between Metra and the Illinois Department of Transportation ("IDOT").

Respectfully, the Court overlooked the fact that Metra's counterclaim as it related to the 2017 Grant Agreement was premised primarily on Section 2.1(c) of that Agreement. That section,

by which UP is clearly bound, requires UP to operate commuter service for the duration of the useful life of the improvements funded in part by Metra, or, in the alternative, to afford Metra the use of the UP West Line tracks for the operation of commuter rail service for the duration of the useful life of the improvements. Metra quoted Section 2.1(c) in its proposed counterclaim, but the Court neither addressed nor acknowledged it in the Order. The Order also overlooked Paragraph M of Exhibit E to the 2017 Grant Agreement, which reiterates the requirements of Section 2.1(c). Lastly, with respect to its finding that the IDOT Agreement was immaterial because UP was not a party to it, the Court overlooked Section 7.2 of the 2017 Grant Agreement, which provides, "UPRR shall comply, to the extent applicable, with the requirements attached hereto as Exhibit E, which is hereby made a part of this Agreement."

UP's obligation to continue the operation of commuter service under the 2017 Grant Agreement does not depend upon the existence of a purchase of service agreement or an enforceable common carrier obligation. Instead, that obligation is contractual and was the consideration UP promised Metra in exchange for up to $44.5 million in funding to improve both freight and commuter service on the UP West Line. Accordingly, the Court should have granted Metra leave to file the proposed counterclaim as it relates to the 2017 Grant Agreement, notwithstanding the Court's finding that UP has no federal common carrier obligation to operate commuter service.

In addition, the Court should now grant Metra leave to amend to add a counterclaim based on a grant agreement entered into by Metra and UP on July 12, 2021, long after all motions were fully briefed. The 2021 Grant Agreement contains the same obligation to continue operating commuter service as the 2017 Grant Agreement.

1026844\309331269.v1

## II. FACTUAL BACKGROUND

**A.      The Relationship Between Metra and UP.**

Metra provides commuter service to and from downtown Chicago with 242 stations over 11 routes totaling approximately 500 route miles and 1,200 miles of track, serving Cook, DuPage, Will, Lake, Kane and McHenry counties in northeastern Illinois and the City of Kenosha in Wisconsin. Doc. 85 ¶ 1. Prior to the COVID-19 pandemic, which resulted in a temporary reduction in daily ridership, Metra provided nearly 251,000 passenger trips system-wide each weekday. *Id*. Prior to the COVID-19 pandemic, the UP Lines provided 97,000 daily passenger trips. *Id.* ¶ 6. UP is a Class I interstate rail carrier that provides common carrier interstate freight service in twenty-three states and over 32,000 miles in the United States. *Id.* ¶ 2.

Commuter rail passenger service on the UP Lines began between 1848 and 1854. Doc. 85 ¶ 13. Under Illinois law, railroad companies were "chartered solely[] for the purpose of exercising the functions and performing the duties of a common carrier. The duties and liabilities of common carriers are clearly defined by the common law, and have been so defined for centuries." *Chicago & A. R. Co. v. People*, 67 Ill. 11, 16 (1873). In 1974, Chicago area voters created the Regional Transportation Authority ("RTA") by referendum to provide tax funds for railroads to subsidize their commuter rail passenger services upon the railroad's request. Regional Transportation Authority Act, 70 ILCS 3615 (2019) ("RTA Act").

Pursuant to the RTA Act, railroads could request subsidization of commuter passenger service from RTA through a Purchase of Service Agreement ("PSA"). 70 ILCS 3615/2.02(c). Chicago & North Western Railway Company ("CNW"), UP's predecessor, negotiated a PSA with RTA and Metra for subsidization of the commuter rail passenger services it continued to provide on the UP Lines. Doc. 85 ¶ 19. CNW continued providing commuter service on the UP Lines

3

subsidized by PSAs executed with RTA until 1995, when UP acquired the CNW. Doc. 85 ¶¶ 23, 24. *Union Pac. Corp., Union Pac. R.R. Co. and Mo. Pac. R.R. Co.—Control—Chi. and N. W. Transp. Co. and Chi. and N. W. Ry. Co.,* ICC Finance Docket No. 32133 (Service Date March 7, 1995). Upon UP's acquisition of CNW, UP, as the surviving entity, succeeded to CNW's ownership of the UP Lines and continued to provide commuter rail passenger service. Doc. 85 ¶ 25. Since 1995, UP has sought, and RTA has continuously provided funding for, UP's commuter rail passenger services pursuant to contracts between the parties. *Id.* ¶¶ 7, 26.

The most recent PSA was negotiated in 2010. Doc. 85 ¶ 27. Under that PSA, UP employees operate the trains, maintain all three commuter lines, and perform various administrative functions. *Id.* ¶ 8. UP owns and maintains the tracks, bridges and signal systems, and substantially all of the right-of-way which are also used for freight operations. *Id.* ¶ 11. Metra retains overall authority over fares and owns the rolling stock used on the UP Lines. *Id.* ¶¶ 10, 11. Metra and UP have, from time-to-time, agreed to extensions of the term of the PSA. *Id.* ¶ 33.

**B.      The 2017 Grant Agreement.**

The RTA Act authorizes Metra to award grants to a "transportation agency" (i.e., a railroad, here CNW, and later UP) for, among other things, "developing or planning public transportation or for constructing or acquiring public transportation facilities, all upon such terms and conditions as that Service Board [Metra] or the Authority [RTA] shall prescribe or as that Service Board [Metra] and the Authority [RTA] or that Service Board [Metra] and the transportation agency shall agree in any grant contract." 70 ILCS 3615/2.02(b). The RTA and Metra combined have invested over $1.2 billion in the infrastructure of the UP Lines. Beginning in 1978 and continuing through 2021, CNW and the RTA, and later UP and Metra, entered into certain grant contracts pursuant to which grants were awarded to CNW/UP for the construction of capital improvements on the UP Lines.

4

The UP West Line is one of the busiest rail lines in the nation. To accommodate passenger and freight volumes and to ensure that passenger service continues to run smoothly and reliably, UP and Metra entered into agreements to develop the UP West Line in four phases. The fourth component of the project is the completion of a third set of tracks in the remaining double-track segments along the line, removing two critical bottlenecks. The construction of the third main would occur in two phases. First, the construction of 1.8 miles of new track from UP's Vale Interlocking Facility in River Forest to 25th Avenue in Melrose Park. And second, the construction of 6.1 miles of new track from Kress Road in West Chicago to Peck Road in Geneva. The upgrade is intended to alleviate existing rail congestion and commuter/freight train conflicts to better serve commuters and to improve the flow of freight into the Chicago region. The first segment of 1.8 miles of the third main commenced in late 2017 pursuant to a Third Main Line Construction Agreement dated May 24, 2017 (the "2017 Grant Agreement"), and the second segment of 6.1 miles pursuant to a Third Main Line Construction Agreement dated July 12, 2021 (the "2021 Grant Agreement") only recently commenced.

UP and Metra entered into the 2017 Grant Agreement, relating to the funding of a third main track for use by UP in both commuter and freight operations. Doc. 67-5. Section 2.1(c) of the 2017 Grant Agreement provides that UP "shall use the Improvements, equipment, and supplies acquired with the proceeds of the Funds for the provision of the Project activity for the duration of their useful life." *Id.* at § 2.1(c). Paragraph M of Exhibit E to the 2017 Grant Agreement reiterated UP's contractual obligation: "UPRR shall use the Project property, equipment, and supplies acquired with the proceeds of the Funds for the provision of the Project activity for the duration of their useful life." Doc. 67-5, Paragraph M thereto.

1026844\309331269.v1

Pursuant to Section 7.2 of the 2017 Grant Agreement, UP also agreed to comply with the requirements of the State Capital Grant Agreement between IDOT and the RTA, which was part of Exhibit E to the 2017 Grant Agreement and was expressly incorporated in the 2017 Grant Agreement. Doc. 67-5 at § 7.2. Item 8 of the State Capital Grant Agreement, titled "Continuation of Service," requires best efforts to continue to provide the commuter services for which the improvements were constructed, and provides that there could be no reduction or termination of such service "without compliance with all applicable statutory and regulatory provisions." *Id.* at Ex. E, Item 8. The improvements to the UP West Line, including the additional segments of the third main line, would be funded 50/50 by Metra and UP up to a maximum contribution by Metra of $44,500,000. *Id.* at 5 of 190 (Recitals); *Id.* at § 3.2(c). Importantly, the improvements to the UP West Line would be solely owned by UP. *Id.* at § 2.1(c). Moreover, the additional segments of the third main are and will be constructed on land owned by UP. Metra has already paid UP $13,725,202.68 under the 2017 Grant Agreement for the 1.8 mile segment, and is contractually committed to pay up to an additional $29,401,279.48 for the 6.1 mile segment.

**C.  UP Commences Litigation and Subsequently Threatens to Discontinue Its Provision of Commuter Rail Service on the UP Lines.**

On December 5, 2019, UP commenced the instant action seeking a declaration that it does not have a federal or state common carrier obligation to operate passenger service on the UP Lines after the PSA expires, and that federal law preempts any state law that purports to impose a common carrier obligation on UP to continue operating passenger service on the UP Lines. Doc. 1.

While the dispute was pending before this Court, UP began to threaten a piecemeal termination of commuter service on the UP Lines, beginning with a letter dated June 30, 2020, from Cynthia M. Sanborn, UP Vice President for Network Planning and Operations. Doc. 85 ¶ 34, Ex. C. In that letter, UP notified Metra that despite the pending action in the district court, UP intended to

1026844\309331269.v1

halt the provision of certain services associated with the UP Lines, on a piecemeal basis, over the coming months. Doc. 85 ¶ 34, Ex. C. However, in response to objection by Metra, UP withdrew its threat to terminate services along this schedule.

On September 10, 2020, Metra filed its answer to the complaint. Doc. 64. On September 11, 2020, the Court entered a briefing schedule for the filing of cross-motions for summary judgment on UP's complaint. Doc. 65.

By letter dated September 23, 2020, UP proposed a new schedule under which operation of the UP Lines would be transferred monthly, on a staggered basis, beginning thirty days after an adjudication by this Court, and before even the expiration of the notice of appeal period, much less the disposition of an appeal.[1]

**D.      Metra's Proposed Counterclaim.**

In light of, among other things, UP's threat to begin terminating services thirty days after this Court's ruling, on October 12, 2020, Metra moved for leave to file a proposed counterclaim. Doc. 67. Metra's proposed counterclaim sought, among other things, a declaratory judgment that UP had a contractual obligation under the 2017 Grant Agreement to continue to provide commuter rail service. Doc. 67-1. Specifically, the proposed counterclaim alleged "Section 2.1(c) of the 2017 Grant Agreement provides that UP 'shall use the Improvements, equipment, and supplies acquired with the proceeds of the Funds for the provision of the Project activity for the duration of their useful life.'" Doc. 67-1, ¶ 42 (citing 2017 Grant Agreement, § 2.1(c)). Metra noticed its motion for presentment on October 20, 2020. Doc. 70.

---

[1] Metra's proposed counterclaim inadvertently identified the September 23, 2020, letter as one dated September 14, 2020, which was corrected in Metra's reply in support of its motion for leave.

1026844\309331269.v1

**E.      The Court's September 23, 2021 Memorandum Opinion and Order.**

On September 23, 2021, the Court entered the Order granting UP's motion for summary judgment, denying Metra's motion for summary judgment, and denying Metra's motion for leave to file the counterclaim. Doc. 105. The Court denied Metra leave to file its proposed counterclaim because the Court found that Metra's counterclaim would be futile in light of the Court's ruling that UP does not have an enforceable common carrier obligation to operate commuter service on the UP Lines. *Id.* at 21-22. The Court's Order overlooked the provisions of the 2017 Grant Agreement upon which Metra relied and which it expressly pled in the proposed counterclaim. As a result, the Court failed to address the independent contractual obligation Metra alleged UP owed to continue providing service pursuant to Section 2.1(c) of the 2017 Grant Agreement. *See generally* Doc. 105. The Court also overlooked Paragraph M of Exhibit E to the 2017 Grant Agreement, reiterating UP's contractual obligation: "UPRR shall use the Project property, equipment, and supplies acquired with the proceeds of the Funds for the provision of the Project activity for the duration of their useful life." Doc. 67-5, Ex. E thereto. The 2017 Grant Agreement was Exhibit D to the proposed counterclaim, Doc. 67-5, and an exhibit to a pleading is part of the pleading for all purposes. Fed. R. Civ. P. 10(c); *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

**F.      The 2021 Grant Agreement.**

UP and Metra entered into the 2021 Grant Agreement, relating to the further funding of a third main track for use by UP in both commuter and freight operations. 2021 Grant Agreement, Ex. A. Like the 2017 Grant Agreement, Section 2.1(c) of the 2021 Grant Agreement provides that UP "shall use the Improvements, equipment, and supplies acquired with the proceeds of the Funds for the provision of the Project activity for the duration of their useful life." *Id.* at § 2.1(c). And, like the 2017 Grant Agreement, Paragraph M of Exhibit E to the 2021 Grant Agreement requires UP to "use

the Project property, equipment, and supplies acquired with the proceeds of the Funds for the provision of the Project activity for the duration of their useful life." Ex. A at Ex. E (Federal Compliance) thereto.

Also like the 2017 Grant Agreement, Section 7.2 of the 2021 Grant Agreement requires UP to comply with the requirements of the State Capital Grant Agreement between IDOT and the RTA, which is part of Exhibit E to the 2021 Grant Agreement and was expressly incorporated in the 2021 Grant Agreement. Ex. A at § 7.2. Item 8 of the State Capital Grant Agreement, titled "Continuation of Service," requires best efforts to continue to provide the commuter services for which the improvements were constructed, and provides that there could be no reduction or termination of such service "without compliance with all applicable statutory and regulatory provisions." Ex. A at Ex. E, Item 8.

The improvements to the UP West Line, including the additional segments of the third main line, would be funded 50/50 by Metra and UP, up to a maximum contribution by Metra of $44,500,000. Ex. A at 1 (Recitals). The improvements to the UP West Line would be solely owned by UP. *Id.* at §2.1(c).

### III.    LEGAL DISCUSSION

**A.    The Court Should Amend or Alter the Order Pursuant to Rule 59(e).**

**i.    Legal Standard.**

The purpose of Rule 59(e) is to permit courts to correct their own errors. *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982) (district court empowered to rectify its own mistakes in period immediately following entry of judgment). A Rule 59(e) motion involves the reconsideration of matters properly encompassed in a decision on the merits. *Banister v. Davis*, 590 U.S. —, 140 S. Ct. 1698 (2020). A court may grant a Rule 59(e) motion to alter or

1026844\309331269.v1

amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact. *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996) (affirming bankruptcy court's decision to grant Rule 59(e) motion based on the presentation of evidence previously unavailable to the movant). The decision whether to grant or deny a Rule 59(e) motion is entrusted to the discretion of the district court. *Id*.

### ii.     The Order Contains A Manifest Error.

Metra respectfully submits that the Court should amend or alter its Order by granting Metra leave to file its counterclaim because: (1) the Court overlooked or misapplied certain key factual allegations and exhibits in Metra's counterclaim that establish the counterclaim is not futile; (2) the 2021 Grant Agreement constitutes new evidence that requires the Court to amend or alter the Order; and (3) manifest injustice will result if the Court does not amend or alter the Order.

### 1.     The Court Overlooked and Misapplied Key Factual Allegations and Exhibits Contained In Metra's Counterclaim, That Establish Metra's Counterclaim Is Not Futile.

The Court reasoned that Metra's proposed counterclaim was futile because, the Court determined, UP did not have a common carrier obligation to continue to provide commuter rail service on the UP Lines. However, the Court did not consider the fact that the 2017 Grant Agreement created a contractual obligation to continue to provide commuter rail service independent of any common carrier obligation or the existence of a PSA. Metra's claim that UP has a contractual obligation to continue to provide commuter rail service under the 2017 Grant Agreement is in no way contingent on whether UP has a common carrier obligation. Whether a common carrier obligation existed did not affect the parties' ability to bargain for a contractual

10

obligation. The Order did not examine whether or why the purported absence of a common carrier obligation would affect the existence of UP's contractual undertaking in the 2017 Grant Agreement.

A district court's mistaken interpretation of a contract is a question of law that is appropriately remedied through a Rule 59(e) motion. *Complete Bus. Sols. Grp. v. Suess*, 2019 U.S. Dist. LEXIS 107351, 2019 WL 2637731, at *13 (E.D. Pa. June 24, 2019) (granting motion to reconsider based on court's misinterpretation of the governing law provision in a contract); *Cruz v. Talmadge*, 244 F. Supp. 3d 231, 236 (D. Mass. 2017) (granting plaintiff's motion to reconsider based on court's mistaken interpretation of the effect of a settlement release).

Courts in this Circuit have recognized and applied this principle. For example, in *Hill-Harriss v. Gingiss Int'l, Inc.*, 1992 U.S. Dist. LEXIS 3548, 1992 WL 57952, at *7 (N.D. Ill. Mar. 19, 1992), the court considered a motion to reconsider an order denying the defendant company's motion to stay proceedings pending arbitration. The court had denied the company's motion to stay because it found that the arbitration agreements included in the parties' franchise contracts were illusory. The company filed a motion to reconsider under Rule 59 in which it argued that the court should reconsider its order based on newly discovered evidence—a number of provisions in the franchise agreements that the court had failed to previously consider, which the company argued represented valid consideration for the plaintiff's promise to arbitrate.

The court explained that a motion to reconsider is appropriate where: (1) a court has patently misunderstood a party; (2) a court has made a decision outside the adversarial issues presented; (3) a court has made an error not of reasoning but of apprehension; or (4) a change in the law or facts has occurred since the submission of the issue. *Id.* at *6 (citing *Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 404 (7th Cir. 1986).). The court granted the company's motion to reconsider because the

11

newly submitted portions of the arbitration agreements, which the court had not previously seen, demonstrated that the agreements to arbitrate were not illusory.

Here, Metra attached the 2017 Grant Agreement to its proposed counterclaim. It also expressly pled, verbatim, the terms of Section 2.1(c). These are more compelling circumstances for reconsideration than the facts in *Hill-Harriss*, where the defendant failed to tender the relevant portions of the contract even though they were readily available to the defendant. And, although *Hill-Harriss* involved a motion to reconsider an interlocutory order, the standard for reconsideration is substantially similar to the standard employed to decide a motion to reconsider under Rule 59(e).

In addition, courts in this Circuit recognize that the entry of relief under Rule 59(e) is appropriate where necessary to correct errors or oversights in rulings. *See, e.g., Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 814 (7th Cir. 2012) (granting the plaintiff-policyholders' motion to reconsider under Rule 59(e) to correct an error caused by the court's misapplication of the policyholders' argument and the facts of the case concerning the amount of interest claimed by the policyholder); *see also Troy v. Kenard Corp.*, 1997 U.S. Dist. LEXIS 185, 1997 WL 12789, *8 (N.D. Ill. Jan. 8, 1997) (granting motion to reconsider to reduce a judgment to prevent manifest injustice where the court's prior judgment did not reflect a defendant's payment, which should have reduced the amount of the judgment).

Metra respectfully submits that the Court's finding of futility without considering the merits of the 2017 Grant Agreement alleged in the counterclaim results in manifest injustice. The 2017 Grant Agreement contains a clear contractual obligation on the part of UP to provide commuter rail service, and that obligation is unaffected by the Court's finding that continuation of service was not required by a common carrier obligation.

1026844\309331269.v1

Metra recognizes that the Court's decision considered three prior grant agreements between Metra and UP/CNW from 1978, 1981, and 1983. However, those earlier grant agreements are substantially different than the 2017 Grant Agreement. The 1978, 1981 and 1983 agreements required UP to continue to operate commuter service for the useful life of the improvements constructed with the funds, while a purchase of service agreement is in effect, or, if none is in effect, then in accordance with UP's common carrier obligations. The Court found that, in light of its ruling regarding the common carrier obligation (and, presumably, assuming that the PSA would no longer be in effect at some point in the future), the proposed counterclaim was futile as to the first three grant agreements. Doc. 105 at p. 20.

However, unlike the first three grant agreements, the contractual obligation in the 2017 Grant Agreement is not tied to an in-force purchase of service agreement or a common carrier obligation. This is a critical distinction. It demonstrates a meeting of the minds on substantially different terms. The portion of the counterclaim predicated on this section of the 2017 Grant Agreement is *not* rendered futile by the expiration of a PSA or the absence of a common carrier obligation. Indeed, it indicates the parties planned for precisely that contingency.

The Court's Order did not address the provisions of the 2017 Grant Agreement upon which Metra relied and which it expressly pled in the proposed counterclaim. Metra alleged in its proposed counterclaim, "Section 2.1(c) of the 2017 Grant Agreement provides that UP 'shall use the Improvements, equipment, and supplies acquired with the proceeds of the Funds for the provision of the Project activity for the duration of their useful life.'" Doc. 67-1 at ¶ 42 (citing Doc. 67-5 at §2.1(c)).

The phrase "Project activity" is not defined in the 2017 Grant Agreement, but it can logically only mean the use of the improvements to provide freight and commuter service. "Project" is

1026844\309331269.v1

defined to mean the work required to construct the improvements. Doc. 67-5 at 5 of 190 (Recitals). Metra has already supplied UP with $13,725,202.68 of up to $44.5 million to which it is contractually committed for improvements to the UP West line. The contractual expectation of Metra, and of IDOT, as clearly evidenced in the State Capital Grant Agreement, was that commuter service would benefit from these funds. These funds would be allocated to the Project over a period of years commencing in 2017, and continuing through the July 12, 2021 execution of the 2021 Grant Agreement. As more fully addressed below, the 2021 Grant Agreement contains a requirement identical to Section 2.1(c) of the 2017 Grant Agreement. *See* Ex. A at § 2.1(c).

"Project activity" could not logically refer to the construction of the improvements themselves because construing "Project Activity" that way would make the word "activity" superfluous. Moreover, if the terms "Project" and "Project activity" are treated as synonymous, then commuter service would derive no benefit whatsoever from the funds invested by Metra and IDOT. UP could simply cease to use those improvements immediately upon their completion. The 2017 Grant Agreement thus requires UP to continue operating commuter service on the UP West Line for the useful life of the improvements, or, in the alternative, to afford Metra the use of the UP West Line tracks for the operation of commuter rail service for the duration of the useful life of the improvements

"Project activity" necessarily refers to the activities of freight and commuter service for which the improvements would be made. At the very least, the language is (more) reasonably susceptible to this construction. If any other construction is reasonable, then the phrase is ambiguous, in which case parol and other evidence on the subject must be heard. *See Wikoff v. Vanderveld*, 897 F.2d 232, 238 (7th Cir. 1990) (applying Illinois law) (if the trial court determines that the language of the contract is ambiguous, the court may then consider (or admit into evidence

14

for the jury's consideration if a jury is the trier of fact) extrinsic or parol evidence, in addition to the contractual language, to ascertain the intent of the parties).

The Order overlooked all of this. Instead, the Order focused solely on a secondary allegation made by Metra, with respect to Exhibit E to the 2017 Grant Agreement, which was a State Capital Grant Agreement. Item 8 of the State Capital Grant Agreement requires the grantee to use "best efforts to continue to provide the commuter services for which the improvements were constructed," and provides that there could be no reduction or termination of such service "without compliance with all applicable statutory and regulatory provisions." Dkt. 67-5 at Ex. E, Item 8. Metra alleged in its proposed counterclaim that, pursuant to Section 7.2 of the 2017 Grant Agreement, UP was required to comply "with the requirements attached hereto as Exhibit E, which is hereby made a part of this Agreement." *See* Dkt. 67-2 at ¶ 43.

Without any mention of Section 7.2 of the Grant Agreement, the Court found that Exhibit 8 to the State Capital Grant Agreement did not create any obligation on the part of UP because UP was not IDOT's grantee or a party to the State Capital Grant Agreement. The Court's sole basis for finding the proposed counterclaim to be futile with respect to the 2017 Grant Agreement was that "the portion of the 2017 agreement that Metra attempts to enforce against UP is a provision in which *Metra*, not UP, agreed to use its best efforts to continue service." Doc. 105 at 21 (emphasis in original). This failed to consider Metra's other allegations and Section 2.1(c), Section 7.2, and Paragraph M to Exhibit E to the 2017 Grant Agreement. UP was unquestionably bound by all three of those sections, and those sections contained obligations unaffected by the Court's ruling on the common carrier obligation.

For all these reasons, the ruling that Metra's proposed counterclaim was futile with respect to the 2017 Grant Agreement constitutes a manifest error that warrants relief under Rule 59(e).

15

Metra's proposed counterclaim states a claim upon which relief can be granted with respect to the 2017 Grant Agreement, irrespective of the Court's finding that UP does not have a federal common carrier obligation to operate commuter service. Accordingly, the Court should alter or amend the judgment, in part, by granting Metra leave to file the proposed counterclaim, even if limited to the 2017 Grant Agreement.

### 2.    The 2021 Grant Agreement Constitutes New Evidence.

A court may grant a Rule 59(e) motion to alter or amend the judgment if the movant presents newly discovered evidence. *In re Prince*, 85 F.3d at 324. Here, the parties finished briefing the cross motions for summary judgment and motion for leave to amend on November 17, 2020. The 2021 Grant Agreement was not executed until July 12, 2021. The 2021 Grant Agreement constitutes new evidence for purposes of Rule 59. The 2021 Grant Agreement demonstrates a course of dealing and is therefore relevant to the interpretation of the 2017 Grant Agreement. *See Oshana v. FCL Builders, Inc.*, 2012 IL App (1st) 101628, 31 (post-execution conduct relevant to the interpretation of contractual obligations to supervise construction work); *Chicago & N. W. R. Co. v. Peoria & P. U. R. Co.*, 46 Ill. App. 3d 95, 101 (3rd Dist. 1977) (relying on course of conduct to resolve a contractual ambiguity). Accordingly, in addition to the manifest errors of law and/or fact, to the extent of any ambiguity in the 2017 Grant Agreement, the 2021 Grant Agreement constitutes new evidence warranting or further warranting the alteration or amendment of the Order.

### 3.    Manifest Injustice Will Result if the Order is Not Altered or Amended.

A court may grant relief under Rule 59(e) if the failure to do so would result in manifest injustice. *See Troy*, 1997 U.S. Dist. LEXIS 185 at *8 (granting motion to reconsider to reduce a judgment to prevent manifest injustice where the court's prior judgment did not reflect a defendant's payment, which should have reduced the amount of the judgment); *EEOC v. Lockheed Martin*

*Corp.*, 116 F.3d 110, 112 (4th Cir. 1997) (granting EEOC's motion to reconsider order denying enforcement of subpoena issued by the EEOC where denying enforcement of the subpoena was based on a misunderstanding of the relevance of the information sought by the EEOC, and that in the context of a public agency attempting to fulfill its statutorily mandated purpose, manifest injustice would have resulted).

Here, Metra is a public entity attempting to fulfill its statutorily mandated purpose to provide commuter rail service to the general public throughout northeastern Illinois. The Court denied Metra leave to file its proposed counterclaim because it either overlooked or misapplied key provisions of the 2017 Grant Agreement. Given the impact of the Order on the public interest and the tens of thousands of taxpayers who rely upon the UP West Line, it would be manifestly unjust for the Court to not amend or alter the Order to give Metra leave to amend to file its proposed counterclaim, so that Metra's counterclaim can be decided on the merits.

**B.      Metra Should Be Granted Leave to Amend to Plead Its Proposed Counterclaim.**

Insofar as UP may try to argue that relief under Rule 59(e) is not appropriate based on the Court's comments concerning timeliness, that argument fails. The Order did not deny Metra's motion for leave to amend to file its counterclaim due to any such delay, and for good reason. Metra's motion was not unduly late under the circumstances of this case.

As more fully set forth in Metra's motion for leave and reply in support thereof, amendments to pleadings must be allowed unless there is futility, undue delay, undue prejudice, or bad faith. *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357-58 (7th Cir. 2015) (citing *Foman v. Davis*, 371 U.S. 178, 181-82 (1962)). "Courts have therefore liberally granted leave to amend in the absence of these conditions. *See, e.g., Life Plans, Inc.*, 800 F.3d at 358 (reversing district court's denial of plaintiff's motion to amend the complaint to add claims for promissory estoppel and

17

tortious interference and add a new defendant where the defendant failed to demonstrate futility, undue delay, undue prejudice, or bad faith); *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792-93 (7th Cir. 2004) (reversing district court's denial of motion for leave to file a second amended complaint for discrimination eight months after dismissal of the prior complaint, because delay standing alone is not a sufficient ground to warrant denial of leave to amend a complaint, and must instead be coupled with some other reason, usually prejudice to the non-moving party); *Jupiter Aluminum Corp. v. Home Ins. Co.,* 181 F.R.D. 605, 609 (N.D. Ill. 1998) (defendant granted leave to amend to add counterclaim where plaintiff did not demonstrate undue delay, bad faith, dilatory motive, or prejudice).

###### i.      Refusal to Permit Metra's Proposed Amendment was an Abuse of Discretion.

Metra respectfully asserts that it was an abuse of discretion for the Court to deny Metra's motion for leave to amend to file its proposed counterclaim for the following reasons.

***First***, as discussed *supra* at 10-16, Metra's proposed counterclaim is not futile.

***Second***, Metra's motion for leave to amend to file counterclaim was timely. In the Order, the Court stated that, if the proposed counterclaim was not futile, then the Court "might be willing to overlook the lateness of the proposed counterclaim . . ." Doc. 105 at 21. The unique facts and posture of this case demonstrate that the motion for leave to amend was not filed unduly late. The Court noted in the Order that the motion for leave to amend was filed after the close of discovery and after the entry of an agreed briefing schedule on cross motions for summary judgment. While this may seem late in the context of the usual timeline for litigation, such was not the case here.

Metra's motion for leave to file counterclaim was timely. Metra's responsive pleading to the Complaint was due and filed on March 2, 2020. Doc. 26. The Court ruled on this motion on August 27, 2020. Doc. 62. The parties did not conduct ***any*** discovery. Instead, they stipulated to filing cross

1026844\309331269.v1

motions for summary judgment on the common carrier question. The opening briefs would be due on October 19, 2020. Doc. 79. It was not until September 23, 2020, less than one month before the opening briefs were due, that UP informed Metra that it intended to transfer the operation of the UP Lines to Metra, beginning thirty days after the Court ruled on the cross motions for summary judgment. This is the event that created the "actual controversy," in that UP at that point had stated in writing its intent to cease operating service long before the expiration of the useful life of the improvements funded under the 2017 Grant Agreement. Metra filed its motion for leave to amend to file the counterclaim on October 12, 2020, 19 days after UP's September 23, 2020 letter. Metra had answered the Complaint only 33 days prior to filing its motion for leave to amend. Metra filed its motion for leave to file its proposed counterclaim as soon as it reasonably could after receipt of UP's September 23 letter.

In the Order, the Court noted that Metra "filed the motion before the parties had filed their opening summary judgment papers but noticed it up for a hearing date after the first summary judgment papers were due." Doc. 105 at 20. Specifically, Metra filed its motion for leave on October 12, and noticed it up for the earliest available date, which was Tuesday, October 20. This was during the height of the pandemic, and the Court was not hearing presentment motions. On October 20, the court entered a minute order stating that it would take Metra's motion under advisement. The eight day span of time between the date that Metra filed its motion and the date Metra set the motion for presentment does not reflect dilatory conduct.

The Court also noted that Metra was aware of the grant agreements. But the key question for asserting timeliness is not when Metra became aware of the grant agreements, but when Metra became aware of UP's intent to breach those agreements and when UP intended to do so. It was not until September 23, 2020, that Metra had sufficient grounds, on the basis of UP's letter of that date

1026844\309331269.v1

threatening to cease service within the useful life of the improvements, that a ripe "actual controversy" existed for purposes of a declaratory judgment claim. Because Metra's motion for leave to amend to file counterclaim was timely, Metra respectfully submits that it would be an abuse of discretion to deny leave to amend on the basis of delay.

**Third**, UP did not and could not establish any prejudice that would be caused by allowing the amendment. "Almost every amendment of a complaint results in some prejudice to the defendant. New discovery and delay inevitably follow when a plaintiff significantly supplements its complaint. The test in each case then, must be whether undue prejudice would result." *Alberto-Culver Co. v. Gillette Co.*, 408 F. Supp. 1160, 1162 (N.D. Ill. 1976). Increased costs, standing alone, do not demonstrate prejudice. *Carlson v. Northrop Grumman Corp.*, 2014 U.S. Dist. LEXIS 149141, *29 (N.D. Ill. Oct. 20, 2014) (granting motion for leave to amend and rejecting argument that the motion should be denied because it would require additional discovery, and thus additional costs, because additional costs were not a sufficient reason, in and of itself, to warrant denying a motion for leave to amend; if it were, every motion for leave to amend could be denied on grounds that allowing it would require the non-movant to incur additional costs); *Cohn v. Taco Bell Corp.*, 1993 U.S. Dist. LEXIS 13901, 1993 WL 390176, at *7-8 (N.D. Ill. Sep. 29, 1993) (granting motion for leave to amend and rejecting argument that leave should be denied because it would require the non-movant to undertake additional discovery, and thus incur additional cost, because "[t]he fact that extra discovery is required once the Complaint is amended is not enough by itself to warrant denial of the motion to amend").

No undue prejudice would result here because no discovery is required with respect to the 2017 Grant Agreement as it presents a pure question of contract interpretation. At most, if there was an ambiguity, narrow discovery could be taken on the subject of contractual intent. If UP wants

discovery, the Court can allow it. The parties can then file cross motions for summary judgment on the obligations under the 2017 and 2021 Grant Agreements. These are matters that could have been taken up almost one year ago, after the parties briefed the common carrier obligation issues. This additional period of time cannot be attributed to Metra, but in any event the 2017 and 2021 Grant Agreements do not depend on the existence of a common carrier obligation. There is no prejudice to UP. It must answer for the contractual obligations it undertook in exchange for up to $44.5 million, which were used on improvements that will benefit UP. If the Court had allowed Metra's counterclaim a year ago, or if it allows it now, UP sustains no prejudice.

*Fourth*, UP did not argue bad faith or futility in its opposition to Metra's motion for leave. The Court's finding of futility was essentially *sua sponte*. What UP argued was undue delay and undue prejudice, both of which would have to be shown to justify a denial of the motion. *Dubicz*, 377 F.3d at 792-93 (undue delay alone is not sufficient to justify the denial of a motion for leave to amend). Metra persuasively distinguished every case cited by UP in opposition to the motion for leave to amend. Put differently, UP, despite citing well over a dozen cases, could not find even one case in which a court denied leave to amend or affirmed such a denial on facts analogous to those of the case at bar.

*Fifth*, and last, the denial of Metra's motion for leave to amend would be manifestly unjust, particularly if it were to be based on an opinion that the motion for leave should have been filed only weeks sooner. This Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Where a proposed counterclaim is compulsory, the "argument for amendment is especially compelling." *Jupiter Aluminum Corp.*, 181 F.R.D. at 609; *Kimberly-Clark Worldwide Inc. v. First Quality Baby Prods. LLC*, 2015 U.S. Dist. LEXIS 46494, 2015 WL 1582368, at *31 (E.D. Wis.

21

Apr. 9, 2015) ("the fact that a counterclaim is 'compulsory' is a reason for granting leave to amend, since if amendment is not allowed the counterclaim will be barred in subsequent actions").

UP contends (though Metra disagrees) that Metra's proposed counterclaim is compulsory. It might make this same argument with respect to a counterclaim concerning the 2021 Grant Agreement. Between the 2017 Grant Agreement and the 2021 Grant Agreement, Metra has committed to paying UP up to $44.5 million for improvements to the UP West Line. Metra has already paid UP more than $13 million of this amount. UP would argue that, by virtue of the Court's futility finding, Metra is barred from ever enforcing UP's contractual duties under Section 2.1(c) and Paragraph M of Exhibit E to both the 2017 and 2021 Grant Agreements. If such were the effect of the Court's ruling, UP can walk away with tens of millions of dollars for improvements that will solely benefit its private interest, without providing any consideration to the public.

### ii. The Court Should Grant Metra Leave to Add a Claim Under the 2021 Grant Agreement With Its Proposed Counterclaim.

Once a judgment has been entered disposing of the entire case, a party can seek leave to amend under Rule 15(a) after having the judgment reopened under either Rule 59 or 60. *Paganis v. Blonstein*, 3 F.3d 1067, 1072 (7th Cir. 1993); *Swam v. United States*, 327 F.2d 431 (7th Cir. 1964). Amendments to pleadings must be allowed unless there is futility, undue delay, undue prejudice, or bad faith. *Foman*, 371 U.S. at 181-82.

Here, the 2021 Grant Agreement did not even exist until July 12, 2021, approximately seven months after the parties completed briefing. As explained above, Section 2.1(c) of the 2021 Grant Agreement requires UP to operate commuter service during the useful life of the improvements. In addition, Paragraph M of Exhibit E to the 2021 Grant Agreement reiterates this requirement: "UPRR shall use the Project property, equipment, and supplies acquired with the proceeds of the

22

Funds for the provision of the Project activity for the duration of their useful life." Ex. A at Ex. E thereto, Paragraph M.

The work under the 2021 Grant Agreement is just now commencing. UP has stated its intent to begin to transfer the operation of commuter service to Metra thirty days after the September 23, 2021 entry of the Order. Accordingly, there is an actual controversy concerning UP's obligations under the 2021 Grant Agreement.

If the Court alters the Order under Rule 59(e) (which it should), then the Court should also grant Metra leave to amend to file the proposed counterclaim attached hereto as **Exhibit B**, which differs from the prior proposed counterclaim only insofar as it asserts the 2021 Grant Agreement.

## IV. CONCLUSION

WHEREFORE, Defendant/Counter-Plaintiff, The Commuter Rail Division of the Regional Transportation Authority, respectfully requests the Court to alter or amend the September 23, 2021 order by granting Metra leave to amend to file its proposed counterclaim attached as Exhibit B, or alternatively by granting Metra leave to amend to file its proposed counterclaim at Doc. 67-1, and by granting such other relief as the Court deems appropriate.

Respectfully submitted,

**The Commuter Rail Division of the Regional Transportation Authority**

By: */s/ Robert T. Shannon*
One of Its Attorneys

Robert T. Shannon
rshannon@hinshawlaw.com
Adam L. Saper
asaper@hinshawlaw.com
Hinshaw & Culbertson LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinoi 60601
(312) 704-3000

1026844\309331269.v1

## **CERTIFICATE OF SERVICE**

     The undersigned certifies that the foregoing instrument was served on all parties of record on October 20, 2021, via ECF.


By: _/s/Robert T. Shannon_____
Attorney for Metra